[Civ. No. 7567.   Third Dist.   Oct. 22, 1948.]

JAMES O. McFARLAND, Petitioner v. SUPERIOR COURT OF MERCED COUNTY et al., Respondents.

154

Andrew J. Eyman for Petitioner.

Fred N. Howser, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondents.

THOMPSON, J.—By means of a writ of prohibition the petitioner seeks to prevent the Superior Court of Merced County from trying him for the alleged crime of manslaughter for which he was indicted. The cause grew out of an automo-

bile casualty in which three persons were killed. The defendant named in the indictment was charged, under section 192 of the Penal Code, in three counts, with causing the deaths of said persons by gross negligence in operating his truck and trailer without due caution and circumspection. The indictment was chiefly based on the evidence of a highway patrolman that the skid marks and scars on the paved surface of the highway indicated that the defendant's truck was more than 4 feet over the white line on the wrong side of the road when the collision occurred.

The petition for writ of prohibition alleges that the indictment is invalid on account of irregularities of the grand jury, a total lack of evidence of negligence of the defendant and persuasion by the prosecuting officer which induced the defendant to become a witness before the grand jury on his own behalf. The transcript of evidence is before this court. A motion before the trial court to set aside the indictment under section 995 of the Penal Code, for the foregoing reasons, was denied. It is alleged the petitioner is without a speedy or adequate remedy at law.

The accident occurred about noon on July 22, 1947, on the public highway between Merced and Los Banos, about 8 miles east of Los Banos, where the roadway curves in the form of a letter "S." It was a clear day, without rain or fog. There was then no other traffic in sight. The defendant was employed in driving his truck and trailer for the Purity Stores. He had completed the delivery of goods for that day, and was returning to his home. He had eaten his luncheon and was driving westerly at a speed of about 40 miles per hour. He was alone in the truck. As he approached the turn of the road to his left, he observed a Buick sedan "coming into the curve on the other end" at a rate of speed which he estimated at 70 or 75 miles per hour. The defendant claimed he was traveling on his proper right hand side of the white line. He said, "When he got right close to me, well, he was coming over, you know, toward me, and before I knew it, why he was over on my side . . . and then he hit the front wheel. . . . You could see where it knocked the whole front axle out from under the truck." A spring was broken. The driver of the truck lost control, and the machine skidded and traveled 170 feet or more westerly and landed "down in the ditch on the north side." He denied that his truck was ever on the wrong side of the road.

The Buick machine landed in the ditch on the south side of the highway about 200 feet easterly and beyond the point of collision. It was badly damaged. Mr. Frank C. Ventura, the driver of the Buick car, and his 4-year-old daughter, Irene, were instantly killed. Marlene Fagundes, a niece of Mr. Ventura, was fatally injured as a result of the accident, and she was taken to a hospital and died soon afterward. Mary Ventura, the wife of Frank, was injured, but apparently not seriously. She was the only living survivor of the accident except the driver of the truck. She testified that she was engaged in unwrapping a package of gum at the time of the collision and did not see the approaching truck. She testified to no important facts except the death of her husband and the two children as a result of the accident.

After the accident occurred, the defendant, who was un-injured, at the suggestion of a stranger who arrived at the scene, telephoned for a traffic officer. The officer, Neil C. Nicholsen, who had served in that capacity for 18 years, promptly arrived and made a careful investigation of the affair. He located the approximate point of impact from "marks" and "gouges" in the pavement, and a portion of a broken spring, beginning at a point "four feet and six inches" beyond the white line on the south side of the highway. The scars in the surface of the highway and a "solid tire mark" extended "from the first gouge mark including the tire mark to where it crossed the center line was 170 feet, 7 inches, that is on the south side of the center line." He found the truck and trailer in its damaged condition, with a broken front axle and spring, some distance westerly on the north side of the highway, in the ditch. The Buick machine was found badly damaged, in the ditch on the south side of the road some distance from the point of impact. Mr. Ventura, the driver of the Buick car and his daughter Irene were dead. Marlene Fagundes, his niece, was seriously injured. Mr. Brooks, the county coroner, was promptly summoned, and soon arrived. The niece was taken to the hospital and died soon thereafter. The traffic officer took the statement of the defendant, who merely told him: "I was going west and the other car was going east and he pulled over toward me and I started to pull over and he hit me on the front and left side." There was no evidence of the presence of any other living persons at the time of the accident, except the defendant and Mrs. Ventura. There is no evidence of any other traffic

on the highway at the time of the accident. Based on the location of the marks and scars and the broken portion of the spring which the traffic officer found more than 4 feet beyond the white line on the wrong side of the highway, he swore to a complaint in the justice's court, charging the defendant with manslaughter. A preliminary hearing was held, and the charge was dismissed. We have no record of what evidence was adduced at that hearing. The grand jury later investigated the affair, and the defendant was indicted, as we have previously stated. The indictment was based chiefly on the testimony of the traffic officer, indicating that the truck and trailer were far over the white line on the wrong side of the road when the accident occurred.

The grand jury issued a subpoena for the defendant on the assumption that he might wish to testify in his own behalf. The only witnesses, other than the defendant, who testified before the grand jury were the traffic officer, the coroner and Mrs. Ventura.

After the indictment was filed, and defendant's motion to set it aside had been denied, this petition for a writ of prohibition was filed in this court.

The only issues to be determined on this proceeding are whether the writ lies under the circumstances of this case, whether the evidence adduced before the grand jury "taken together, if unexplained or uncontradicted, would *in their judgment* warrant a conviction by a trial jury" (Pen. Code, § 921), and whether the admission of hearsay and incompetent evidence, or the conduct of the deputy attorney general, who was presenting the case, or the conduct of the members of the grand jury rendered the indictment void.

We are of the opinion the indictment is not void for any of the reasons assigned, or at all. The defendant was charged under section 192 of the Penal Code with the crime of manslaughter committed "without malice" by unlawfully driving his vehicle with "gross negligence" and by committing an act without due caution and circumspection which "might produce death, in an unlawful manner." We think the use of the term "gross negligence" is immaterial. There was no demurrer to the indictment. There was some evidence that the cause of the accident was that the defendant was driving his truck at that time around the curve in the highway far over on the wrong side of the road, and that it did result in the deaths of the three persons named in the dif-

ferent counts of the indictment. Without explanation or contradiction of those facts by the defendant, which section 921 contemplates may be disregarded, and which the grand jury had a right to disbelieve, the jurors had the discretion to determine, "in their judgment" whether the evidence would "warrant a conviction by a trial jury." In that event the section last mentioned declares that the jury "ought to find an indictment," as it did. We may not interfere with that discretion of the grand jury, or weigh the evidence adduced to determine its sufficiency. ■ Other incompetent evidence which was adduced in the nature of opinions of the traffic officer and the coroner that they did not believe the defendant's statement that he was not on the wrong side of the highway, and that they believed he was guilty of unlawful homicide, constitute mere irregularities in the proceedings before the grand jury, which did not affect its jurisdiction and which should therefore be disregarded on this proceeding. To be sure, the defendant had no opportunity to object to those improper questions asked by the deputy attorney general. We definitely disapprove of those inquiries. But they furnished no evidence of a lack of jurisdiction to return the indictment. We may concede that those answers might have influenced some grand jurors in returning the indictment. ■ We must, however, presume that the grand jurors obeyed their oaths to present no person through malice, hatred, ill will or prejudice, and to present only "the truth, the whole truth and nothing but the truth," according to their "skill and understanding." (Pen. Code, § 903.)

■ An indictment may not be set aside merely because some incompetent evidence was received by the grand jury, provided there is substantial competent evidence upon which the grand jury is authorized in its judgment to return the indictment. Section 995 of the Penal Code does not authorize the setting aside of an indictment for insufficiency of evidence, or because incompetent evidence is received or considered. (*Stern* v. *Superior Court,* 78 Cal.App.2d 9, 18 [177 P.2d 308] ; *People* v. *Hatch,* 13 Cal.App. 521, 528 [109 P. 1097] ; 14 Cal.Jur. § 59, p. 76.) In the Hatch case the district attorney advised the grand jury that there was adequate evidence to warrant the finding of an indictment. The court said :

". . . The law contemplates that only competent evidence be received by the grand jury, yet if it should receive in-

competent evidence and found an indictment thereon, there is no method of reviewing its action in so doing. An indictment is but an accusatory paper, and it was never intended that on a motion to dismiss, irregularities in the proceedings before the grand jury should be reviewed, except as expressly provided in the statute.''

The only modification of the foregoing rule recognized by our California courts is that when there is *absolutely no competent evidence* before the grand jury of the commission of the crime by the accused person, upon a writ of prohibition the indictment will be held to be invalid. (*Greenberg* v. *Superior Court*, 19 Cal.2d 319, 322 [121 P.2d 713] ; *People* v. *Schuber*, 71 Cal.App.2d 773 [163 P.2d 498].) And when there is *a total absence of evidence* to support a necessary element of the crime charged, upon a similar proceeding, the indictment will be held to be invalid for that reason. (*Dong Haw* v. *Superior Court*, 81 Cal.App.2d 153 [183 P.2d 724].)

In the Greenberg case the Supreme Court said:

''The transcript of the testimony upon which the indictment was based *contains no evidence even remotely supporting the charges made against petitioner.*'' (Italics added.)

In the Schuber case a previous writ of habeas corpus was granted for the absence of evidence showing that a public offense had been committed. The defendant was rearrested and again held to answer after another preliminary hearing. On motion of the defendant the information was dismissed. On appeal from that order, this court said: ''The transcript on this appeal contains no new competent evidence of the commission of a public offense, or that the defendant is guilty thereof.'' The prisoner was therefore discharged. In the Dong Haw case a writ of prohibition was granted as to the petitioner on the ground that the transcript of evidence before the grand jury disclosed absolutely no evidence that he had offered or authorized payment of money for the purpose of attempting to bribe a public officer to permit unlawful gambling in the city of Sacramento. The Greenberg case did hold that ''A grand jury that indicts a person when *no evidence has been presented* to connect him with the commission of the crime charged, exceeds the authority conferred upon it by the Constitution and laws of the State of California,'' [Italics added] and therefore justifies the issuance of a writ of prohibition to prevent a trial on the merits. The court said in that case that the accused person, under

such circumstances, had no speedy or adequate remedy at law because "He could not be required to stand trial and to appeal from a possible adverse judgment without being subjected to unreasonable expense, inconvenience, and delay." (Citing authorities.) The preceding cases are not applicable to the facts of this proceeding, in which some evidence was adduced before the grand jury of the commission of the offense charged and that the defendant was guilty thereof.

■ Upon prohibition, an indictment may not be held to be invalid for mere irregularities in impaneling the grand jury or in the proceedings which lead to an indictment. (50 C.J. § 45, p. 680; 42 C.J.S. § 24c(2), p. 868.) In the text of 50 Corpus Juris, *supra,* which is supported by numerous authorities, it is said:

"Under the general rule that prohibition will not lie for the correction of errors or irregularities committed by an inferior tribunal acting within its jurisdiction, the writ has frequently been refused when sought for such purpose in criminal or quasi-criminal proceedings."

■ The grand jury is an inquisitorial body of very ancient origin and a constituent part or agency of the court, created for the protection of society and the enforcement of law. It is entitled to the respect and support of the courts. (38 C.J.S. § 1, pp. 982-984.) Section 927 of the Penal Code provides that:

"A grand juror cannot be questioned for anything he may say or any vote he may give in the grand jury relative to a matter legally pending before the jury, except for a perjury of which he may have been guilty, in making an accusation or giving testimony to his fellow-jurors."

The district attorney or his deputies may properly appear before the grand jury, upon request of the grand jury, or otherwise, to give advice or to interrogate witnesses. Likewise, the attorney general is empowered to procure counsel to present evidence in a matter under investigation before the grand jury. (Pen. Code, § 925.)

■ Fairly construed, we think the evidence before the grand jury does not warrant the petitioner's construction that the defendant was improperly persuaded against his will to become a witness at that hearing. "The grand jury is not *bound* to hear evidence for the defendant; but . . . when they have reason to believe that other evidence within their reach will explain away the charge, they should order such evidence

to be produced. . . ." (Italics added.) (Pen. Code, § 920.) In this case the grand jury had already subpoenaed the defendant. It may be reasonably inferred they thought the defendant might satisfactorily explain why the skid marks indicated that his truck was more than 4 feet over on the wrong side of the white line of the highway when the accident occurred, by, for instance, showing that, on account of mechanical defects of his machine, of which he was previously unaware, or otherwise, he had lost control of it. For that purpose, or to determine the credibility of the testimony of the defendant as compared with the contradictory evidence of the traffic officer regarding the location of the truck at the time of the accident, his evidence might fairly account for the admonition to the witness by the deputy attorney general, before he testified to any material facts involved in the cause of the accident, that "I think it only fair to warn you that what you might say here might be used against you. On the other hand it might be used in your favor, depending on what it is, in the event that you are subsequently prosecuted as a result of an indictment by this Grand Jury." Again the deputy attorney general said to the witness, "If you care to make a statement to the Grand Jury on your version of how it happened you can do so. I admonish you again that you don't have to make any statement because it might be used against you or on the other hand it might be used in your favor in the event of a subsequent trial." That officer further warned the witness that "If you do make a statement . . . it is only fair to tell you that anything that you say of course will be possibly the subject of cross questions by myself or the jury. In other words, we want you to understand thoroughly what you are telling us" is subject to cross-examination. The officer then said, "Now if you care to make a statement to the Grand Jury, your statement is now invited, . . . ." After the foregoing admonitions the defendant made a full statement of the circumstances surrounding the accident in which he definitely and positively asserted that his truck was not on the wrong side of the highway. On cross-examination he adhered strictly to that assertion. His evidence was all favorable to his theory that he was guilty of no negligence or violation of traffic law which led to the accident. It was the sole province of the grand jury to determine the credibility of his evidence.

It is true that before the defendant had testified to any material facts this colloquy occurred:

"Q. . . . You know what this is all about right at the present time? A. Yes, sir. Q. O. K. Well, now with that in mind, do you care to make any statement to this Grand Jury with respect to the vehicle accident which I have already described in which three persons were killed? A. No. Q. You don't care to make any statement? A. No. Q. Well, is that your answer? A. *I didn't understand you.* [Italics added.] Q. I say what is your answer, do you care to make a statement to the Grand Jury with respect to your part in that accident or don't you? A. I don't know. Q. Well, that is something you yourself have got to decide. A. Well, do you mean how it happened? Q. If you care to make a statement to the Grand Jury on your version of how it happened you can do so. I admonish you again that you don't have to make a statement because it might be used against you or on the other hand it might be used in your favor in the event of a subsequent trial."

We think the defendant was fully admonished that he was not required to testify before the grand jury, and that if he did so his testimony might be used against him. It seems apparent that the defendant's first answers above quoted, to the effect that he did not care to make a statement were because he did not understand exactly what the prosecuting officer was asking him. We do not construe the record as supporting petitioner's claim that he was persuaded by any misleading or improper statements to become a witness on his own behalf. He must have understood that he was not compelled to testify before the grand jury, and that if he did so, his evidence might be used against him. The statement that defendant's evidence might be used in his favor was certainly unusual, and possibly improper. But, in view of the entire record, we are convinced it was not prejudicial so as to render the indictment invalid on that account. That is true in view of the fact that his evidence was all favorable to the defendant. It contains no admissions against his interest.

For the foregoing reasons the writ of prohibition is denied.

Adams, P. J., and Peek, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied December 20, 1948.