[Crim. No. 5512. Second Dist., Div. Two. July 27, 1956.]

THE PEOPLE, Appellant, v. DANIEL RISSMAN, Respondent.

Edmund G. Brown, Attorney General, and William E. James, Deputy District Attorney, for Appellant.

Grossman & Rosen and Herbert Grossman for Respondent.

MOORE, P. J.—Respondent was indicted for having violated section 653f of the Penal Code in that (count I) he did solicit Caspar Berger to offer and accept and join in the offer and acceptance of a bribe, November 15, 1952. Count III charges the same crime in that on December 25, 1952, he did solicit Albert Levin to do a similar act. Count II charges grand theft in that on November 15, 1952, he violated section 487, subdivision 1, of the Penal Code by taking more than $200 in lawful money, the personal property of Caspar Berger. Count IV charges grand theft in that on December 25, 1952, respondent did take more than $200 in lawful money, the personal property of Albert Levin. Pursuant to motion

under section 995, subdivision 2, of the Penal Code, the court set aside the indictment.

From the entire record it appears that in 1952 some person in the office of the Board of Equalization had divulged to certain favored friends that he would cause on-sale liquor licenses to be issued to applicants who would pay extravagant sums therefor. Two individuals who were encouraged to discover potential applicants were Dick Stovall and William Ferguson. The latter was then business representative of the Bartenders' Union while his associate was secretary-treasurer of that union.

Ferguson testified to the following acts: After a meeting of the business agents, secretary and president of the union, in November 1952, Stovall told Ferguson that he had or could procure as many as eight on-sale liquor licenses and asked Ferguson whether the latter knew anyone in the market for such a license at a price of $5,500; that the actual amount required by the officer of the Board of Equalization was $2,400 and that Ferguson's commission on a sale would be 50 per cent of the excess over the cost of the license.

Two bartenders, Jay Teale and Karl Berge, visited Ferguson to inquire where they could get a license for a friend, to wit, Caspar Berger at 912 West Pico Street. Ferguson called on Berger and told him the price was $5,500, all cash, no checks. Berger promptly accepted the offer. When Ferguson reported to Stovall his sale to Berger, he was directed to advise Berger to make his application at the office of the board. The applicant followed instructions and in due season the license was issued. Thereupon Stovall accompanied Ferguson to Berger's saloon and received the $5,500 from their applicant. The currency was placed in a large, white business envelope which Ferguson inserted into his inside coat pocket The pair thereupon visited the Moose Lodge where they delivered it to Rissman. Nothing was said about the white envelope or its contents but the trio retired to the clubroom and partook generously of alcoholic beverages.

Ferguson testified that during the same period, one Karl Berge inquired whether "I knew how he might get a license for a friend who managed a bowling alley in El Monte"; that he visited the bowling hall and met Mr. Jones, the manager; after Jones had explained that Mr. Taylor owned the place, Ferguson unfolded his proposition and stated his price was $5,500. Jones asked whether he might raise the price $1,000 to which Ferguson assented. When Jones

offered to get from Taylor a cashier's check for $6,500, Ferguson assured him the check would not be cashed until the license had been issued, but Stovall rejected the offer and said only cash would be acceptable. Thereafter, Taylor called at the union, met Ferguson and asked for reassurance that he was dealing with a person whose word was good and could produce according to his promise. Taylor gave Stovall the money. While it was not seen by Ferguson, Taylor and Stovall mentioned $6,000 several times. After Berger and Taylor had procured their licenses, Stovall paid Ferguson $300 and the latter paid Jay Teale $125 and Karl Berge $50. Ferguson called upon Rissman at the New Palace Café and protested the small sum paid him. Together they called upon Stovall at the union and after Rissman's conversation with Stovall, the latter paid Ferguson another $100. When the latter spoke to Rissman about his demand for more money, respondent replied: "These licenses cost more than we thought they would cost. We have been out quite a bit of money and, honestly, this is all we received. You are getting more than we got. In the future you give us $4,000. Anything above that will be yours."

### Berger's Testimony

Caspar Berger testified that Stovall told him he would receive special consideration if he made the purchase. When Caspar indicated to Jay Teale that a license could be had for $4,500, Teale told him that the "Old Man," i.e. Mr. Bonelli, then a member of the board, would not sell a license for less than $6,000. While Berger was hesitating to pay such price, a liquor officer told him: "You are started on this license deal; if you back out you will antagonize them and you may never get a license." For fear of consequences, Berger paid the $6,000 for which Ferguson gave him an IOU. He suffered many delays before receiving a license, but after he had paid the money, Ferguson and Stovall returned and said: "The Old Man just bawled the devil out of us for deducting $262.50; said the price was a flat $6,000."

After he began operating under his "on-sale" license, officers of the Board of Equalization harassed him by frequent calls when they said Berger did not have enough spoons and forks or food and required him to purchase more of such equipment and suspended his license for failing to keep food sales up to requirements, contrary to the fact.

## THE LEVIN LICENSE

Prior to the preceding events, Paul Bershin became acquainted with Rissman in August 1952 when he discussed with respondent the latter's ability to get a new on-sale liquor license. Such conversations were repeated until December 1952 when respondent told Bershin he was in a position to get a new license issued by the Board of Equalization. Acting upon such statement by Rissman, Bershin introduced him to Albert Levin, whereupon they discussed the advantage of "putting a whiskey license in a beer spot" and it would be worth more money. Levin told Rissman he had no place to put a license. After they had discussed the licensing of a bar at 3129 West 8th Street, Rissman said: "You can make application for the location for the license prior to the time the bar is built; licenses have been issued to vacant lots where buildings have later come on there." Rissman's offer to get Levin a license for $3,500 was agreeable to the latter and it was issued. Levin, however, sold his license to Mike Musso for $6,000.

Albert Levin corroborates in detail the testimony of Mr. Bershin whose office address was used for Levin's application. Bershin introduced him to Rissman at the New Palace Café where an agreement was promptly made for the sale of a license to Levin for $3,500. When Levin returned the following day, the price was raised to $4,000, and Rissman said his people would accept no less for a new license from the state board. Rissman told him to use 3129 West 8th Street as the address on his application; that it would not be necessary for him to have a legitimate bar there. Levin paid $4,000 in currency to Bershin who delivered it to Rissman in Levin's presence. The application was prepared and Levin, under Rissman's instructions, called at the board's office in the Black Building, and asked to see Mr. Moran. The license was issued in the early days of 1953. Levin testified that he sold the license four months later for $6,000.

## THE SALE TO KINNARD

Bershin testified that about the time of the negotiations of Levin and Rissman, respondent had met Cecil Kinnard about a whiskey license for his beer bar at 310 East 5th Street; that Kinnard desired a whiskey license and inquired of Bershin whether the board was issuing licenses. He was told to see Rissman. He did see respondent who offered to secure a new license for Kinnard for $3,500.

Mr. Kinnard declined to testify "on the grounds that his answers might incriminate him."

John Petiva testified that he knew Kinnard was going to get a license and heard him say so. Bershin told the witness that he would get him $200 or a new suit of clothes. He heard Bershin say to Kinnard that the only reason the witness was there was because Bershin had promised Petiva a license for someone else. After he knew the license had been issued to Kinnard, Petiva and Bershin drove to a local store where Kinnard presented a new suit to Petiva.

### Admissions of the Underlings

Prior to the appearance of the foregoing witnesses before the grand jury, the law-enforcing agencies attempted to obtain information in aid of the investigation. Raymond J. Stonehouse, a special agent for the attorney general, conferred with Ferguson and Stovall; Stovall had stated that in August 1952 he had called at the Board of Equalization. He there met Mr. Hansen and asked whether he could get a license for the Bartenders' Union. Hansen referred him to Moran who took his name and address and two months later when he returned to the board, he was directed to apply for a liquor license which he duly received. At first Stovall denied all knowledge of Ellis Taylor, but after inspecting a photostat of his own receipt to Taylor, he denied only having anything to do with the license issued to Caspar Berger. He knew the latter had met Ferguson at the 912 Club many times and that on one occasion Berger gave Ferguson an envelope containing some money and thereafter he and Ferguson visited with Rissman at the Moose Lodge. Stovall stated to Mr. Stonehouse that Taylor had come to the Bartenders' Union to ascertain what Stovall could do about a liquor license; that he telephoned Moran at the board's office and told him that Taylor was in his office and wished a license; then Moran directed him to take $6,000 from Taylor and send him to the board to file his application. He said that subsequently he met Moran in the drugstore below the office of the board and gave him $6,000 which was to pay Moran for the license issued to Stovall at the Bartenders' Union. For many years he had known Rissman and that the latter had been indicted with Bonelli. He asserted that he knew of no connection Rissman had with liquor licenses, but Moran "got a good word from the Old Man," meaning Bonelli. He said for the first time, about a year and a half ago he had heard the

rumor that somebody had paid extra to get a license but that so far as he knew, licenses are issued for the statutory fees.

On the eve of Ferguson's appearance before the grand jury, Stovall visited him at the home of Victor De Marchi in Los Angeles. He told Ferguson that he was going to state his name and address but would answer no questions that might incriminate him and thought it "would be the wise thing for all of us to do so." He said there was no use in bringing Rissman's name into this; that they had nothing to fear; that Brizell of the union and Mr. Moran of the Board of Equalization were both dead. "My gosh, I wish I'd have gone to Texas with you and stayed down there." After Stonehouse had interviewed Ferguson, the latter called at the Mardi Gras and attempted to engage Rissman in conversation, but respondent "didn't remember me." After a few words had passed, Rissman stepped into another room, returned with Stovall and said: "You have nothing to fear; Moran is dead; you go get a night's sleep."

To warrant the denial of a motion under section 995 of the Penal Code, it is not necessary that the proof be so complete as to justify a conviction of the accused. Probable cause is shown if a man of ordinary caution would be induced by the evidence, heard by the grand jury, to believe and seriously entertain a strong suspicion of the guilt of the accused. (*Bompensiero* v. *Superior Court*, 44 Cal.2d 178, 183 [281 P.2d 250].) An indictment will not be set aside if there is some rational ground for assuming the possibility that an offense had been committed and the accused is guilty of it. (*Ibid.*)

Direct proof of a formal understanding between parties to the conspiracy is not required as the basis of an indictment or information. It was not necessary for the State to prove that the parties actually came together, mutually discussed their common design and after reaching a formal agreement, set out upon their previously agreed course of conduct. The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime, usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts of the same complete whole. (*Lorenson* v. *Superior Court*, 35 Cal.2d 49, 56 [216 P.2d 859].)

The question is not whether the accused is guilty of the crime charged but only whether the evidence received by

the grand jury was sufficient to establish reasonable cause to warrant the return of the indictment. (*People* v. *Sears*, 124 Cal.App.2d 839, 841, 842 [269 P.2d 683].)

 The evidence was sufficient to warrant a finding that Rissman was an active conspirator in a plan to solicit persons to offer or accept or to join in the offer and acceptance of a bribe for the issuance of liquor licenses by the State Board of Equalization.

The evidence proves that an applicant sought to file an application with the board, but it was denied; that he was subsequently contacted by one of the conspirators and told that by paying $4,000 to $6,000, a license would be granted. When the money was paid to one of the conspirators, the applicant was directed to proceed at a specified time to a particular board office and see a named liquor control officer who would accept the application. He did so and his application was accepted.

 It is the rule that when from a statement of facts it appears that a crime has been committed and there is a doubt as to the particular crime, the indictment may allege the facts in separate counts and charge the accused with as many specific crimes as may be deduced from such facts.

 Therefore, if the facts proved did not show a solicitation of a bribe, they established a violation of section 487, subdivision 1, of the Penal Code: obtaining money by false pretenses or by trick and device. Such practice was approved in *People* v. *Adams*, 137 Cal.App.2d 660 [290 P.2d 944]; *People* v. *Chamberlain*, 96 Cal.App.2d 178 [214 P.2d 600]; *People* v. *Sears*, 124 Cal.App.2d 839, 853 [269 P.2d 683].)

It is supererogation to observe that the facts disclosed before the grand jury in the matter of sales by the regulatory board of on-sale liquor licenses for extravagant sums of money to indiscriminate persons is a matter of grave concern. Such evidence indicates that while virtue sleeps, vice is rampant; while men of honor are endeavoring to construct an enduring state, termitical bipeds are gnawing the foundations of the capitol; while an industrious people confidently strive for the amelioration of our social order, they are shocked to a realization that their aims are being thwarted and their struggle might end in frustration. A trial of the instant action may not only result in bringing a miscreant to justice or in defeating his plans, but, also, the welfare of society

may thereby be reinforced to the discomfort of lurking enemies of the State.

The order is reversed with instructions to deny the motion.

Fox, J., and Ashburn, J., concurred.

A petition for a rehearing was denied August 6, 1956, and the following opinion was then rendered:

THE COURT.—In his petition for rehearing, respondent emphasizes the point that certain testimony given before the grand jury was hearsay. ▮▮▮ There are two answers to this criticism: namely, the testimony proved that a conspiracy existed between respondent and the witnesses Stoval and Ferguson, therefore testimony quoting those conspirators was admissible to prove the existence of criminal intent; also, the presence of some incompetent testimony before the grand jurors is not sufficient to upset an indictment when, as here, sufficient competent evidence was adduced upon every element of the crimes alleged. (*People* v. *Nathanson,* 134 Cal.App.2d 43, 45 [284 P.2d 975]; *McFarland* v. *Superior Court,* 88 Cal. App.2d 153, 158-159 [198 P.2d 318].)