[Crim. No. 5989. Third Dist. May 7, 1971.]

THE PEOPLE, Plaintiff and Appellant, v.
ALFRED BRITZ et al., Defendants and Respondents.

[Crim. No. 5990. Third Dist. May 7, 1971.]

THE PEOPLE, Plaintiff and Appellant, v.
LOUIS MARDER, Defendant and Respondent.

(Consolidated Cases.)

## Counsel

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Eddie T. Keller, Deputy Attorney General, for Plaintiff and Appellant.

John Kappos for Defendants and Respondents.

## OPINION

BRAY, J.*—Cases consolidated for appeal.

In case No. 5989 the People appeal from an order of the San Joaquin County Superior Court dismissing as to the defendants Britz and Marder counts IV and V of the grand jury indictment.

In case No. 5990 the People appeal from an order of said court dismissing as to defendant Louis Marder count I of the grand jury indictment.

### QUESTION PRESENTED

The dismissals were incorrect as there was evidence of intent to defraud.

### RECORD

In case No. 5989 an indictment was filed charging defendants Britz, Marder and Sokol in count I with violation of Penal Code section 182 (conspiracy to bribe an employee of a financial institution); in count II with violation of Penal Code section 639 (bribery of an employee of a financial institution); in count III with violation of Penal Code section 182 (conspiracy to commit grand theft); in count IV with violation of Penal Code section 487, subdivision 1 (grand theft); and in count V with violation of Penal Code section 476a (issuing checks without sufficient funds).

In case No. 5990 an indictment was filed charging defendants Marder and Sokol in count I with violation of Penal Code section 487, subdivision 1 (grand theft); in count II (Sokol only) with violation of Penal Code section 476a (issuing checks without sufficient funds); in count III (Marder only) with violation of Penal Code section 639 (bribery of an employee of a financial institution).

In case No. 5989 defendants filed a motion for discovery to suppress evidence and to dismiss the indictments under Penal Code section 995. In case No. 5990 defendant Marder filed such a motion.[1]

In case No. 5989 the court granted the motion to dismiss counts IV and V and denied it as to the other counts. In case No. 5990 the court granted the motion to dismiss count I. In each instance the denial was on the ground that no intent to defraud was evident in the record.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]The motions as to discovery and suppression of evidence were granted in certain particulars.

## The Facts

The facts as disclosed in the evidence before the grand jury were practically the same in each case.

During 1969 Frank Yaddow was the manager of AVCO Thrift Company office on Miner Avenue in Stockton. On September 5, 1969, Louis Marder was sent to Yaddow as a business prospect. Marder told Yaddow that he was the chief stockholder in Westward Investment Corporation and that he was planning to merge that company, along with some others, into Spectrum, Ltd., a public corporation. Marder indicated that when the merger was complete he might consider depositing unused capital in AVCO, and that he would refer the projected three hundred employees of Spectrum to AVCO for loan business. Marder said the merger was secret and when it became public knowledge the value of Spectrum stock would go up rapidly.

Marder told Yaddow that he and Al Britz, his associate in Westward Investment Corporation, had tied up most of their money in the merger and therefore were interested in obtaining a $200,000 loan from AVCO. Yaddow said AVCO normally did not make that large a loan. Marder also expressed interest in AVCO Thrift certificates, which are an investment or savings medium, and took a copy of a certificate with him.

On September 12, 1969, Marder phoned Yaddow and suggested that he and Joseph Broderick, manager of the AVCO Thrift office on Pacific Avenue in Stockton, meet in his room at the Holiday Inn. At the meeting Marder indicated that he had taken over Shield Industries and that since he and Britz had their available capital tied up in completing government contracts for Shield Industries he needed additional cash to complete the Spectrum merger. Marder said Yaddow could assist him since he (Marder) knew of a perfectly legal way to use Thrift certificates to complete the Spectrum deal. Marder said if they could come to terms he would supply 105,000 shares of Westward stock to Spectrum to form a conduit or holding company, and that the stock would be shared equally by Yaddow, Broderick and Marder. Marder mentioned a $100,000 Thrift certificate. At the time Yaddow did not understand how Marder planned to proceed. After this meeting Marder sent Yaddow a letter of intent to form a separate holding corporation.

On September 13, 1969, Yaddow was flown to Las Vegas and entertained at the expense of Westward Investment Corporation. Marder told Yaddow that he (Yaddow) would be a valuable person to have on the board of directors of Spectrum when the merger was completed, at a salary of $25,000 per year, more than double the salary Yaddow was receiving

from AVCO Thrift. Yaddow met Britz, one of Marder's associates in Westward Investment.

On September 15, 1969, an argreement was entered into between Herbert L. Sokol and Westward Investment Corporation by Alfred H. Britz. The agreement recited that Sokol had available through a third party approximately $450,000 in various forms of savings certificates which Sokol would lend to Westward for the purpose of "borrowing, hypothecating or statement." In exchange Westward agreed to loan Sokol 100,000 shares of its stock all of which Sokol was free to hypothecate and 60,000 of which Sokol was free to sell, but 40,000 of which were to be returned to Westward on termination of the agreement. Westward also agreed to loan Sokol 10 percent of the cash proceeds realized by Westward from hypothecation of the Thrift certificates. Westward declared it was contemplating merger with a publicly held company.

On September 16 or 17, 1969, Yaddow became acquainted with Sokol through Broderick. Sokol said he was in the process of concluding several significant business ventures, that he had money available, that he was extremely interested in Thrift certificates, and that he, Yaddow and Broderick might enjoy a business relationship in the future. A day or two later Marder called Yaddow to a meeting which included Sokol and Britz. Marder needed $100,000 in Thrift certificates that he could use to obtain cash to complete the Westward-Spectrum merger, and he left the problem of consummating the deal to Sokol, Yaddow and Broderick.

On September 22, 1969, Sokol met with Yaddow and Broderick. Sokol proposed that they deliver $100,000 in AVCO Thrift certificates to Marder in exchange for 200,000 shares of Westward stock which Sokol would hold as trustee for the benefit of a to-be-formed corporation in which Marder, Sokol, Yaddow and Broderick would each own 50,000 shares. This agreement was reduced to writing. It was agreed that Sokol would purchase the certificates that day, and that he and Yaddow would go to Las Vegas to complete the transaction with Marder.

Later that day Sokol presented a check payable to AVCO Thrift for $100,000 drawn on the Michigan bank account of Petro Tech and signed by Sokol. Yaddow understood that there were not funds in the Michigan bank to cover the check; but Sokol had shown Yaddow documents which indicated that monies were in transit from overseas. Yaddow believed that there would soon be funds in the Michigan bank account. It was a mandatory AVCO Thrift policy that a Thrift certificate purchased by an out-of-state or foreign country check could not be issued until funds were actually received on the check. It was absolutely impermissible to issue a

Thrift certificate in exchange for an insufficient funds check, even if the branch manager was assured that the check would be good by the time it arrived at the bank. Nevertheless, in exchange for the insufficient funds check, Yaddow had two $50,000 AVCO Thrift certificates prepared dated September 22, 1969, and payable to Marder.

Sokol and Yaddow flew to Las Vegas where they met with Marder and Britz. Marder seemed pleased with the agreement they had brought. After a discussion between him and Sokol about discharging some agreement of which Yaddow was unaware, the words "as per agreement dated Sept. 15, 1969" were added to the September 22 agreement, and it was signed by Britz, Sokol and Yaddow. At Marder's direction Britz prepared four Westward Investment Corporation stock certificates, each for 50,000 shares, which went to Sokol to hold. Yaddow signed the two $50,000 AVCO Thrift certificates and delivered them to Marder.

On October 6, 1969, the Petro Tech check in the amount of $100,000 signed by Sokol was returned from the Michigan bank for insufficient funds.[2] It was a mandatory policy of AVCO that when a check was returned for insufficient funds, AVCO would issue its own check to repurchase the dishonored one. A branch manager was never permitted to resubmit a check or a substitute check without using an AVCO check to repurchase it first. However, on October 8, 1969, Broderick took two $50,000 drafts signed by Sokol to the Bank of America in Stockton to replace the returned $100,000 check. The two $50,000 drafts were not honored by the Michigan bank nor by the San Francisco office of Petro Tech. On October 23, 1969, they were charged against the AVCO account at the Bank of America.

CASE No. 5989

*The Court Erred in Dismissing Count IV
and Count V*

■ "To warrant the denial of a motion under section 995 of the Penal Code, it is not necessary that the proof be so complete as to justify a conviction of the accused. ■ Probable cause is shown if a man of ordinary caution would be induced by the evidence, heard by the grand

---

[2]During the summer of 1969 the Michigan bank learned that an account would be opened by sizable deposits from Petro Tech. The bank had checks for the account prepared and sent to the company. Petro Tech was notified that the account was not opened because the bank had not received appropriate account identification information and that the two deposits, one for $2,100 and one for $3,500, were being held in escrow. The Michigan bank received approximately fifteen checks, some in six-figure amounts, for payment against this unopened account. The amount of the deposits was returned to Petro Tech on its request on October 7, 1969.

jury, to believe and seriously entertain a strong suspicion of the guilt of the accused. (*Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 183 [281 P.2d 250].) ■ An indictment will not be set aside if there is some rational ground for assuming the possibility that an offense had been committed and the accused is guilty of it." (*People* v. *Rissman* (1956) 143 Cal.App.2d 488, 494 [299 P.2d 944].).

■ Defendants Marder and Britz were parties to a conspiracy with Sokol and Yaddow to acquire the Thrift certificates. If a crime was committed by Sokol or Yaddow in acquiring the Thrift certificates, defendants Marder and Britz are equally guilty. (*People* v. *Causey* (1963) 220 Cal. App.2d 641, 653-654 [34 Cal.Rptr. 43]; *People* v. *Nance* (1960) 181 Cal.App.2d 147 [5 Cal.Rptr. 130].) A conspirator does not have to participate in the crime conspired. (*People* v. *Malotte* (1956) 46 Cal.2d 59, 65 [292 P.2d 517].)

■ "Direct proof of a formal understanding between parties to the conspiracy is not required as the basis of an indictment or information. It was not necessary for the State to prove that the parties actually came together, mutually discussed their common design and after reaching a formal agreement, set out upon their previously agreed course of conduct. ■ The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime, usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts of the same complete whole. (*Lorenson* v. *Superior Court,* 35 Cal.2d 49, 56 [216 P.2d 859].)" (*People* v. *Rissman, supra,* 143 Cal.App.2d at p. 494.)

■ Grand theft which is charged in count IV of the indictment includes the crimes of embezzlement and of obtaining property by false pretenses. (*People* v. *Schwenkner* (1961) 191 Cal.App.2d 46 [12 Cal. Rptr. 408].) ■ Embezzlement is defined as the fraudulent appropriation of property by one to whom it is entrusted. (Pen. Code, § 503.) The offense is complete when the agent or trustee diverts the trust property from the trust purpose. (*People* v. *Parker* (1965) 235 Cal.App.2d 100, 109 [44 Cal.Rptr. 909].) The crime is committed even though the intent is to deprive the owner of his property only temporarily. (*People* v. *McClain* (1956) 140 Cal.App.2d 899 [295 P.2d 952].) ■ Yaddow, as branch manager, was entrusted with AVCO Thrift certificates. When he issued and delivered two $50,000 Thrift certificates to Marder in exchange for Sokol's insufficient funds check drawn on an out-of-state bank, he was fraudulently appropriating those certificates to his own use, namely, to obtain for himself stock in Westward Investment Corporation pursuant to his agreement with defendants. (See *People* v. *Zimmer* (1937) 23 Cal. App.2d 581 [73 P.2d 923].)

In *People* v. *Fronk* (1927) 82 Cal.App. 465 [255 P. 777], the court held the facts were sufficient to support a conviction of embezzlement where the bank manager and defendant were very friendly; the manager received money and gifts from defendant whom he thought of as an easy spender; the manager knew defendant kited a considerable number of checks but believed defendant could easily take care of all concealed overdrafts thus created; the manager had no authority to make loans for the bank or to accept personal checks on banks other than his own in return for cashier's checks; the manager issued cashier's checks in exchange for personal checks which were not honored. The evidence received by the grand jury in this case is sufficient to establish reasonable cause for returning an indictment for grand theft on the theory of embezzlement.

The evidence is also sufficient to establish reasonable cause for returning an indictment for grand theft on the theory of obtaining property by false pretenses. ■ The elements of the offense are (1) that the defendant made a false pretense or representation, (2) that the representation was made with intent to defraud the owner of his property, and (3) that the owner was in fact defrauded in that he parted with his property in reliance upon the representation. (*People* v. *Parker* (1965) 235 Cal. App.2d 86, 92 [44 Cal.Rptr. 900].) ■ Sokol represented to Yaddow that money was en route to the Michigan bank to cover the $100,000 check Sokol gave for the Thrift certificates. Sokol had previously told Yaddow that he (Sokol) would soon receive a substantial amount of money because of the conclusion of several significant business ventures. Marder had told Yaddow that the value of the Westward Investment Corporation stock, which he would receive as a result of their agreement, would go up rapidly as a result of the merger of Westward and Shield into Spectrum, the public corporation. Marder said the merger was 95 percent complete because he (Marder) had the requisite 80 percent control of Shield. Yaddow was told he would be employed by the new corporation. There was still another representation to Yaddow that Marder intended to form a separate holding or conduit corporation with Yaddow and Broderick. None of these representations materialized. The account in the Michigan bank was never formally opened. The $100,000 check was never made good. The merger did not take place. There was evidence that Marder had only 58 percent of the stock in Shield, not 80 percent as he claimed. No separate holding company was formed. The evidence is sufficient to raise a strong suspicion that the representations were false and that they were made with the intent to defraud. ■ "Intent to defraud is an essential element of grand theft by false pretenses, but such intention is inferable from the facts." (*People* v. *Brady* (1969) 275 Cal. App.2d 984, 996 [80 Cal.Rptr. 418].)

When Yaddow issued and delivered the Thrift certificates to Marder, the third element of the offense was satisfied. It makes no difference that he might have thought Sokol's check would be covered eventually. The fraud intended is consummated by obtaining possession of the property sought. (*People* v. *Brady, supra,* at p. 995.)

In dismissing count V of the indictment, violation of Penal Code section 476a, issuing checks without sufficient funds, the trial court relied on *People* v. *Wilkins* (1924) 67 Cal.App. 758 [228 P. 367], as affirmed in *In re Griffin* (1927) 83 Cal.App. 779 [257 P. 458], and *People* v. *Burnett* (1952) 39 Cal.2d 556 [247 P.2d 828].

The cases hold that there can be no conviction under section 476a if the payee is informed by the maker at the time of delivery that there are insufficient funds to pay the check. However, the situation in the instant case is different than in the cases cited. Here there is plenty of evidence from which the grand jury could reasonably conclude as to Sokol's intent. "The specific intent to defraud . . . may be inferred from all surrounding circumstances." (*People* v. *Costello* (1963) 223 Cal.App.2d 748, 751 [36 Cal.Rptr. 155].) Taking the representations about the check against the backdrop of the general conspiracy to unlawfully acquire AVCO Thrift certificates in which the parties, including Yaddow, were engaged, the unfulfilled representations to Yaddow regarding the proposed corporate merger, the obvious conflict of interest position to AVCO in which Yaddow was placed by his dealing with defendants, the fact that no account was ever appropriately opened with the bank on which the checks were drawn, and the fact that a series of worthless checks were utilized to unlawfully acquire AVCO property, an inference of intent to defraud is forced. Moreover, the payee of Sokol's worthless checks was not Yaddow. It was AVCO and under the circumstances Yaddow's knowledge of the worthlessness of the checks cannot be imputed to AVCO. The fraud is against AVCO and not Yaddow. "An agent can never have authority, either actual or ostensible, to do an act which is, and is known or suspected by the person with whom he deals, to be a fraud upon the principal." (Civ. Code, § 2306.) In *People* v. *Zimmer* (1937) 23 Cal. App.2d 581, 585 [73 P.2d 923], the court said, "Defendants cannot bribe employees of the bank to accept their worthless checks, knowing that the employees are violating their trust in appropriating the funds of the bank, and escape liability by asserting that knowledge on the part of the employees was knowledge of the bank."

Yaddow's conduct could not possibly be deemed innocent, for even if funds had been forthcoming, this would merely have served to restore that which had been fraudulently appropriated. There can be no doubt

of the complicity in the fraud of Sokol and the other defendants. It was only as a result of their joint efforts, unkept promises and bribe to Yaddow that Yaddow agreed to misappropriate AVCO property. Sokol provided the means to acquire the property, i.e., the unopened bank accounts. A strong and reasonable conclusion is that defendants were aware of and, in fact, directed Sokol to utilize these means. Moreover, as parties to the conspiracy with Sokol to acquire the certificates, defendants are bound by all acts of Sokol done in furtherance of the conspiracy, which included his issuance of the worthless checks. (*People* v. *Butts* (1965) 236 Cal. App.2d 817, 829-830 [46 Cal.Rptr. 362].)

The guilt of defendants is based on more than the representations made by Sokol concerning the worthless checks. Defendants were the prime movers in an elaborate scheme to induce Yaddow to unlawfully part with AVCO Thrift certificates. Relying upon the confidence which they had carefully cultivated with Yaddow, defendants made grandiose promises to Yaddow in regard to a projected corporate merger, the eventual value of the stock Yaddow received, and Yaddow's possible employment with the new corporation. The lure of these attractions was sufficient to induce Yaddow to violate his position of trust with AVCO and provide defendants with valuable property for which they paid nothing. Although Yaddow performed his part of the bargain, defendants did not. No corporate merger ever took place. No separate holding company was ever formed. None of the shares of Westward Investment Corporation stock Yaddow was to be beneficiary of was ever exchanged for Spectrum stock as defendants had agreed; nor did Yaddow receive any value. Thus, viewing the sum of the dealings between defendants and Yaddow, it is a strong and reasonable inference that defendants' nonperformance could not be validly characterized as "ordinary commercial defaults," and that their promises and agreements were made with an intent to defraud AVCO and unlawfully obtain its property. (Cf. *People* v. *Ashley* (1954) 42 Cal.2d 246, 265 [267 P.2d 271].)

There was ample evidence to hold defendants to answer for grand theft and for issuing checks without sufficient funds. The trial court erred in dismissing counts IV and V.

CASE No. 5990

*Count I Which the Court Dismissed Charged*
*Defendant Marder With Grand Theft*

The facts hereinbefore related apply to this count. Specifically related to this charge are the following additional facts: On September 25, 1969, Sokol told Yaddow that he needed $30,000 to complete an

agreement he had made earlier with defendant Marder. Sokol stated that he intended writing a check for that amount but the necessary funds had not arrived at his Michigan bank. It was then agreed that Sokol would write a check to AVCO drawn on Sokol's Petro Tech Michigan bank account. In return Yaddow would give Sokol an AVCO check for the same amount.

The next morning Yaddow met defendant Marder, who explained that they needed an additional $30,000 right away and Sokol was in the process of raising the money. Yaddow then told Marder that Sokol would write a check for that amount and that Yaddow would issue an AVCO check for a similar amount. In exchange Yaddow wanted an employment contract identical to the one Marder had theretofore shown him. Marder said, "You have got it," and stated the contract would be prepared later that day.

The same day Yaddow, Sokol, Marder, Britz and Broderick met at Shield Industries. Yaddow's employment contract was discussed. Marder stressed the urgency need for the $30,000 to consummate his deal with Sokol. The parties were to meet again after the $30,000 was secured. Sokol and Yaddow met at the AVCO office. Sokol drew a check on Petro Tech's account in the Michigan bank for $30,000 in favor of AVCO. Yaddow believed Sokol's assurance that although the money was not there to cover the check it would be there by the time the check was presented. Yaddow then drew and delivered to Sokol an AVCO check for $30,000.

Sokol exchanged this $30,000 check and another AVCO check in the amount of $20,000 (which Yaddow had given Sokol the day before together with three $10,000 AVCO certificates in exchange for a $50,000 check drawn by Sokol on the Michigan bank account) at the Bank of America for four cashier's checks in the amounts of $35,000, $3,500, $1,000 and $4,000, respectively. He also received $6,500 in cash. Yaddow over the telephone identified Sokol for the Bank of America teller. Yaddow then met Sokol, Marder, Britz and Broderick. Yaddow noticed that Sokol had two cashier's checks, one payable to Westward Liquidation Account in the amount of $1,000, and the other for $35,000 payable to Spectrum, Ltd., marked "Per Westward Spectrum closing agreement." It was earlier agreed that these checks were to be delivered to defendant Marder in exchange for an employment contract.

Marder had prepared an "Employment Agreement" employing Yaddow as a consultant with Spectrum, Ltd. Yaddow signed it, as did defendant Marder. A document entitled "Acknowledgment" was then signed by Yaddow, Sokol and Broderick. It recited that all obligations pursuant to a September 15, 1969, agreement between the parties had been completed, that 200,000 shares of Westward Investment Corporation stock in Sokol's

name were irrevocably the property of Yaddow, Broderick, Sokol and defendant Marder, and/or Britz. Marder received from Sokol two cashier's checks totaling $36,000. Four stock certificates of Westward Investment Corporation were distributed to Yaddow, Broderick, Sokol and Marder, each receiving a certificate for 50,000 shares. The $30,000 and $50,000 checks issued by Sokol were returned to the Bank of America by the Michigan bank as "unable to locate the account," or for lack of sufficient funds. The bank telephoned Yaddow who said they would be taken care of immediately.

Sokol gave Yaddow a letter dated October 10, 1969, from Rivers, the president of Petro Tech, enclosing five checks payable to AVCO totaling $680,000. It directed Yaddow to replace the $30,000 and $50,000 checks Sokol had given him with an $80,000 draft drawn by Rivers on a Brussels, Belgium bank. The letter indicated that by October 15 there would be sufficient funds in the Brussels bank to cover the draft. Yaddow substituted the draft for the two checks. Subsequently, the draft was returned unpaid. Yaddow indicated that the holding company he had agreed to form with Marder, Britz, Broderick and Sokol never came into being. The shares of Westward Investment Corporation were never exchanged for Spectrum stock as agreed, nor did the stock's price ever skyrocket in value as projected. Although Yaddow had accepted Sokol's $30,000 check, knowing it was insufficient for lack of funds, only in order to receive an employment contract from Marder, Yaddow never received any of the salary which Marder's employment contract had promised.

AVCO Thrift never received payment for the $30,000 or $50,000 checks from Sokol or for the $80,000 bank draft from Rivers. Nor did AVCO receive payment for the three $10,000 Thrift certificates Yaddow issued to Sokol.

The People contend the trial court erred in dismissing count I (grand theft) against defendant Marder. We concur.

If Marder was party to a conspiracy that included Yaddow and Sokol, and if a crime was committed by Sokol or Yaddow in furtherance of that conspiracy, then Marder is equally guilty. (*People* v. *Causey, supra,* 220 Cal.App.2d 641, 653-654; *People* v. *Nance* (1960) 181 Cal.App.2d 147 [5 Cal.Rptr. 130].) A conspirator does not have to participate in the crime conspired. (*People* v. *Malotte, supra,* 46 Cal.2d at p. 65.) It is not even necessary that there be formal agreement to each step of a common design. The extent of the assent of minds may be inferred from the circumstances. (*Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49, 56 [216 P.2d 859].) Marder was told by Yaddow that he (Yaddow) was going to give Sokol

an AVCO check in return for Sokol's check. It could be inferred that Sokol's check was insufficient and that the exchange of checks was in furtherance of their common scheme. There was probable cause for the grand jury to suspect a conspiracy.

Yaddow, as branch manager, was entrusted with the funds in the AVCO Thrift account. When he issued a $30,000 AVCO check to Sokol in exchange for a check of like amount, which was insufficient for lack of funds, he was diverting the trust property from the trust purpose. He was appropriating the funds to his own use, namely, to obtain for himself an employment contract. The evidence is sufficient to establish reasonable cause for returning an indictment for grand theft on the theory of embezzlement. (See *People* v. *Fronk, supra,* 82 Cal.App. 465.)

The evidence is also sufficient to establish reasonable cause for grand theft on the theory of obtaining property by false pretenses. Sokol represented to Yaddow that funds would be forthcoming to cover the $30,000 check, for which check Marder represented that Yaddow would be employed at an attractive salary. These representations did not materialize. That the representations were made with intent to defraud can be inferred from the facts. (*People* v. *Brady, supra,* 275 Cal.App.2d at p. 986.) One of those facts is that the Michigan bank account was never opened. The effect of Yaddow's knowledge that there were insufficient funds to cover the checks is fully discussed hereinbefore in connection with case No. 5990. That knowledge was not AVCO's knowledge.

There was ample evidence to show probable cause of defendant Marder being guilty of grand theft as charged in count I, and the count should not have been dismissed.

In case No. 5989 the order dismissing counts IV and V is reversed. In case No. 5990 the order dismissing count I is reversed. In both cases the superior court is instructed to deny the motions for dismissal.

Pierce, P. J., and Regan, J., concurred.