[Crim. No. 9560. Second Dist., Div. Four. June 2, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. JOSEPH H. COLLINS, Defendant and Appellant.

Burton Marks for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

FILES, P. J.—This appeal is from a judgment following a jury trial in which the defendant was convicted of conspiracy to commit grand theft (Pen. Code, § 182) and six counts of grand theft (Pen. Code, §§ 484, 487).

Defendant was the dominant figure in Pacific Trust Deed Association which operated between January 1960 and November 18, 1960, following which it went into receivership. The victims of the various offenses are persons who paid money to Pacific to be invested in second trust deeds.

### The Evidence

The facts upon which the judgment rests will be stated in accordance with the familiar rule that an appellate court must accept as true every fact and inference which the jury could reasonably have deduced from the evidence. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)

In the latter part of 1959, defendant Collins suggested to Cornelius L. Witt that they organize the business which was to become known as Pacific Trust Deed Association. Collins put in the initial capital of $20,000, and Witt put in some cash as loans which were later repaid to him. The two agreed to be equal owners of the business. Although a corporation was formed, no stock was issued. Witt was designated president, but Collins, who held no office, made all of the major decisions and was the final authority on all matters.

Witt was indicted along with Collins, but pleaded guilty and testified for the prosecution against Collins.

The business of Pacific was purchasing notes secured by real property trust deeds and reselling them to investors at a price which would yield the investor an interest rate of 10 percent. The plan, as presented to the public, was that the investor's money would first be placed in a trust account in the Califor-

nia Bank. Pacific would select a second trust deed and offer it to the investor for his approval. If the investor approved, he would sign an authorization for the withdrawal of his funds from the trust account, whereupon the trust deed would be transferred to him and recorded in his name. The claimed advantages of this kind of investment were described in printed brochures, radio advertising, and personal solicitation by the company's salesmen. Some of the representations appearing in the pamphlet which the company distributed to prospective investors are the following: ''The skillful and experienced appraisers composing this [appraisal] department make a physical examination of each parcel of property involved in a purchase transaction. . . .''

''A thorough analysis of the credit information, title, appraisal and area involved is made [by Pacific's loan committee] before the purchase of a Trust Deed is consummated.''

''Pacific handles all details of each transaction, makes collections on your behalf and mails you a check (or credits your account) each month for your 10% earnings with no charge to you for these services.''

''[E]very Pacific employee is covered by an Errors and Omissions Policy to insure safety in proper documentation of your account.''

''Your funds are always kept in a trust account until legal title to a trust deed (approved by you) is vested in your name!''

''Legal title is vested and recorded in your name.''

The actual operation of the company differed markedly from what the advertising promised.

Mr. Arens, the victim of the theft described in count II of the indictment, invested $7,500 on and prior to March 24, 1960. He received one trust deed valued at $2,000. He was offered additional trust deeds over the telephone only but not any specific ones. He never received the return of his money.

Mr. Mogul (the victim in count III) invested $5,000 on April 28, 1960. He agreed to accept one trust deed for $3,000 and one for $2,479.04. He received the former but not the latter. He never received any interest or any of his money back or any other trust deed.

Mr. Bek, the victim in counts IV and VIII, read the advertising, and in reliance thereon sent in a check for $2,262 with the understanding that $2,000 was to be invested and $262 returned. On July 6, 1960, he signed a printed ''customer

account authorization'' supplied by Pacific, which provided that the funds would be deposited in his name in an escrow account pending selection and assignment of a trust deed to him. The printed form contained this statement: ''Should you [Pacific] not conclude a transaction to my (our) satisfaction, it is understood that I (we) may have my (our) funds returned in full.'' Bek's check for $2,262 was in fact deposited in the name of Pacific Trust Deed Association, Inc. in its ''trust account'' in the California Bank.

Around November 1, Bek sent in an additional $1,516. He received a letter from Pacific dated November 7 stating that his note and trust deed were ''. . . in the process of being recorded at the County Recorder's office. . . .'' The correspondence indicates that the trust deed being assigned to Bek was one made by Earl and Mary Conarty. Bek received back $262 from his first payment, the odd $16 from his second payment, and three checks totaling less than $100 as purported interest, but never received any trust deed or any return of his principal. The evidence shows that in November 1960 Pacific had purchased from Ballbrook Investment Company a trust deed made by Earl and Mary Conarty as trustors, for a price of $2,310.50. The check which Pacific gave Ballbrook was dishonored at the bank, so Ballbrook took back the Conarty trust deed.

Mr. Finochio, the victim in count V, signed ''confirmations'' for the purchase of two specifically described trust deeds and turned over $5,000 to Pacific on July 30. He received one trust deed for which he was charged $2,759.19. The balance of his money was not returned.

Mrs. Bates, the victim in count VI, sent Pacific a check for $1,500 on February 16. In August Pacific sent her a description of a trust deed and asked her to sign documents indicating her acceptance of it and her consent to the withdrawal of funds from the trust account. She signed and returned the documents, but she never received a trust deed or interest or a return of her money.

Several other investors similarly testified that they had been attracted by the advertising, had paid in money expecting it to be held in trust until a trust deed was transferred. Each had received neither a trust deed nor a return of his money.

When the receiver took over the business immediately after November 18, 1960, the records of the company were found to be in appalling confusion. The outside accountant employed by Pacific testified that this disorder had existed from the

beginning, and that he had informed defendant Collins that it was impossible to determine the status of the business from its records.

When Pacific closed its doors on November 18, 1960, its general bank account had a balance of $5.75 and its trust account had an overdraft of $2.24. As of that date there were 455 investor accounts. Ninety-seven investors who had paid in a total of $268,089.58 had been assigned no trust deeds, though the money had been spent. Ninety-three other investors had been "under-assigned." That is, these investors had paid in more money than the price which Pacific had charged them for the trust deeds assigned to them. These under-assignments aggregated $135,092.29. Twenty-three investors had been "equally assigned" and 242 investors were "over-assigned," in the total amount of $64,506.12.

Substantial amounts of cash had been taken from the trust account and used for operating expenses without any assignment of trust deeds to the investors. The company had been troubled with a shortage of cash from the outset. There had been heavy expenses for advertising. Approximately $46,000 had been sent to Arizona to provide working capital for a subsidiary to be organized there. A total of $27,544.88 had been paid out to or for the account of defendant Collins. When an attachment was levied on the company's bank account, investors' trust funds were turned over to a bonding company as collateral for a release of attachment bond.

In the acquisition of trust deeds the procedure actually employed did not resemble that described in the promotional literature. There was no "loan committee" in the ordinary sense of the term. Witt, Collins and various employees decided from time to time on the purchase of trust deeds. Sometimes purchases were made solely upon the recommendation of a selling broker, without any independent investigation or confirmation. There was no errors and omissions policy covering any employee of the company. Collins had tried to purchase such a policy and had been refused.

Collins, testifying on his own behalf, asserted that others were running the company, that he had no idea trust deeds were not being assigned to investors, that he believed the company was operating in accordance with its advertising literature. The jury was of course entitled to reject these protestations in the light of the other evidence.

Defendant Collins argues here that the evidence is insufficient to show a specific intent to commit theft. We may

assume that he never intended that the business should fail or that the investors should lose. But the evidence does show that Collins intended to solicit funds by making representations of fact which were so egregiously false that he could not possibly have believed them to be true. The evidence also compels the finding that moneys paid into a trust account were, under his direction, withdrawn for an alien purpose. Both as a case of theft by false pretenses and theft by embezzlement, the evidence is not merely sufficient. It is overwhelming.

### Effect of the Acquittal of Coconspirators

The contentions which defendant Collins makes with respect to the conspiracy count require a review of the procedural history of the case.

Count I of the indictment originally charged Joseph H. Collins, Cornelius L. Witt, James M. Barr and Robert E. Kersting with having conspired with each other and with other persons unknown to commit grand theft. This was joined with 15 other counts charging one or more of these individuals with grand theft. At the first trial the jury acquitted Barr and Kersting on all counts, acquitted Collins on two theft counts, and acquitted Witt on two theft counts, but was unable to agree with respect to Collins and Witt on the other counts. Before the case was retried Witt pleaded guilty to conspiracy and one count of grand theft. At the second trial Collins alone was retried on the conspiracy count and six theft counts.

Defendant Collins now invokes the rule that where two persons are tried together on the charge that they conspired with each other, if one is acquitted the other must be acquitted also. ■ The theory is that, since one person alone cannot be guilty of conspiracy, if all alleged conspirators except one are found to be innocent, the trier of the fact must be consistent and give the other defendant the benefit of the same finding. (*People* v. *James*, 189 Cal.App.2d 14 [10 Cal.Rptr. 809, 91 A.L.R.2d 697] ; see Note 72 A.L.R. 1180; 91 A.L.R.2d 700.)

This theory does not call for an acquittal of the last remaining defendant if he has been charged with conspiracy with persons other than the defendants who are exonerated. (*People* v. *Sagehorn*, 140 Cal.App.2d 138, 146 [294 P.2d 1062].) That is the situation here. Defendant Collins was accused of conspiracy with Witt, Barr, Kersting and others. Exoneration of Barr and Kersting left unresolved the question whether Collins conspired with Witt and others. ■ If Collins

conspired with only one person instead of many, as charged, he is guilty just the same.

Defendant's theory appears to be that he achieved at least a partial acquittal when Barr and Kersting were exonerated, and that the jury should have been informed of this.

This court is asked to apply, by analogy, *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.,* 58 Cal.2d 601 [25 Cal.Rptr. 559, 375 P.2d 439], in which the judgment convicting Teitelbaum of the crime of filing a fraudulent insurance claim was held to be conclusive against him in a subsequent civil action on the insurance policy. The question raised here is whether this doctrine of collateral estoppel operates against the People when one of the defendants has been acquitted. Counsel have not been able to cite any case where this subject has been discussed.

█ The situation presented is not a novel one and is not limited to conspiracy cases. It frequently happens that two or more persons are charged with the same offense, one is acquitted, and the others are subsequently tried (or retried). Necessarily the acquittal of the one defendant constitutes an adjudication of some issues adversely to the People. Is there then any estoppel against a relitigation of the same issues against the remaining defendants? Are the remaining defendants entitled to have the trial court advise the jury which issues have been decided against the People, and instruct that the remaining defendants may not be convicted except upon a theory consistent with the innocence of the acquitted defendant? We think not.

Any attempt to apply the doctrine of collateral estoppel against the People in this way would create problems of unimaginable complexity in identifying the issues resolved by the prior judgments and drafting meaningful instructions to the jury. The absence of cases discussing this theory is a basis for concluding that the law has not adopted it.

█ At the trial defendant Collins argued that the acquittal of Barr and Kersting, if not res judicata, was at least evidence for the jury to consider. Defendant requested the following jury instruction, which the court declined to give: ''You are instructed that in the previous trial of this matter the defendants, JAMES BARR and ROBERT E. KERSTING were acquitted of all of the offenses charged in the indictment. The fact of these acquittals may be considered by you only for the purpose of rebutting and weakening the evidence offered on the part of the prosecution that these persons were guilty of the offenses charged.''

By this instruction, defendant sought to have the prior judgment considered, not as an adjudication, but as evidence to be weighed against other evidence in the record. Upon that theory the effect of the prior judgment would be to add the weight of the prior jury's conclusion to the evidentiary matter produced at the subsequent trial.[1] The rule is that judgments are not admissible for that purpose. (*Marceau* v. *Travelers' Ins. Co.,* 101 Cal. 338, 344 [35 P. 856, 36 P. 813]; *People* v. *Mitchell,* 100 Cal. 328, 334 [34 P. 698]; *Bowman* v. *Cudworth,* 31 Cal. 148, 154; see 5 Wigmore, Evidence (3d ed.) § 1671a, p. 687; Rest., Judgments, § 93, com. (b).)

In this case Collins could not have been prejudiced by the fact that Barr and Kersting were joined as alleged coconspirators. Had the latter two names been eliminated from the list of alleged coconspirators named in the information, it would not have made the slightest difference in the admissibility of evidence, the weight of the evidence bearing upon the guilt of Collins or in the issues to be resolved by the jury.

Here the conspiracy consisted in the operation of a business, of which Witt was president and Collins was the dominant (though untitled) executive. Barr was an employee and Kersting was an attorney. It could not be denied that all four were working in concert. The real issue, upon which guilt or innocence turned, was which of these men, if any, shared the requisite criminal intent. Barr and Kersting could be acquitted only upon the hypothesis that, although they participated in the fraudulent enterprise, they were not fully aware of its ramifications. Thus their participation did not prove any intent to do an unlawful act. (See *People* v. *Marsh,* 58 Cal.2d 732, 743 [26 Cal.Rptr. 300, 376 P.2d 300].) Witt and Collins, on the other hand, were equal partners in the ownership of the business, and were its actual managers. Witt confessed his guilt by pleading guilty to the conspiracy count. If Collins

---

[1]Defendant concedes he has found no authority for his position except some language in *People* v. *Follette,* 74 Cal.App. 178 [240 P. 502], in which the court held that evidence of an acquittal of another offense was properly rejected because offered by the defendant during the People's case. The opinion of the court contains this language (at p. 215): ''Had the offer been made at the proper time, that is, as a matter of defense, and for the purpose of rebutting the evidence offered on the part of the prosecution, and had the court then denied said offer, a different case would have been presented which might call for a different conclusion.''

We cannot read that sentence as anything more than judicial rumination, avoiding the issue rather than passing upon it. The *Follette* language was picked up, by way of obiter dictum, in *People* v. *Fox,* 126 Cal.App.2d 560, 569 [272 P.2d 832].

conspired with anyone, he conspired with Witt. The jury could not possibly have found Collins guilty of conspiring with Barr and Kersting without also finding that Collins had conspired with Witt. It would not have aided Collins at all for the trial court to have eliminated Barr and Kersting from the list of alleged coconspirators.

It should be added that there is no indication in the record that any involvement of Barr and Kersting was emphasized at the second trial. It does not appear that the indictment was read to the jury or that Barr and Kersting were mentioned in the court's description of the case to the jurors. ■ It is true that some of the overt acts in the indictment were acts of Barr and Kersting, but this is not inconsistent with their acquittal. The specified acts of Barr and Kersting, done as employees of the company controlled by Witt and Collins, were in furtherance of the Witt-Collins conspiracy even though the actors themselves were innocent pawns. (See *People* v. *Gilbert*, 26 Cal.App.2d 1, 23 [78 P.2d 770].)

*Denial of Continuance and Withdrawal of Counsel*

■ Defendant contends that the judgment should be reversed because the court refused to postpone the trial and allow his attorney to withdraw without notice on the morning the trial began.

The record shows that the first trial ended in a mistrial on March 18, 1963. On April 15, 1963, on defendant's motion, Burton Marks was substituted as his attorney, and the case was set for trial June 3, 1963. The minutes of department 100 for Monday, June 3, show "Defendant's motion for continuance is denied. Trial continued to [Thursday] June 6, 1963 at 10:30 A.M. in Department 23." The oral proceedings of June 3 are not a part of the record on appeal, and defendant makes no contention here that the denial of the motion he made on that date was error.

On June 6 Mr. Marks appeared in department 23 and moved for a continuance upon the grounds (1) that he was unprepared for trial and (2) that defendant desired to be tried after Witt's sentencing, which was then scheduled for August 19. Mr. Marks stated to the court that he had been retained by his client with the understanding that he would not commence preparation for trial until his fee had been paid, and therefore he had not prepared. The prosecutor pointed out that a postponement at that time would work a great hardship upon many people. Thirty witnesses were involved, some of whom

had been brought from the northern part of the state. The trial court stated that it believed defendant had had adequate time to prepare, and the motion was denied.

Mr. Marks then made a motion to be relieved as counsel for defendant. No grounds were stated for this motion. The court asked counsel if he felt that the defendant was competent to represent himself and Mr. Marks replied that in his opinion no defendant in a criminal case, unless he was an attorney, was capable of handling his defense properly. The court then asked defendant if he felt competent to represent himself and the answer was "No, sir; I don't." Defendant explained to the court that he had substantial income in prospect from his building business, but was short of cash, and disliked to ask Mr. Marks to work without payment in advance. Defendant expressed no dissatisfaction of any kind with Mr. Marks as an attorney. In answer to the court's question defendant stated that if he had the money he "would be delighted to have Mr. Marks," and that the only reason for relieving him was financial.

It was not an abuse of discretion for the court to deny defendant's untimely motion to postpone the trial (Pen. Code, § 1050). The court could reasonably take with a grain of salt the bland representation of defendant's experienced counsel that he had appeared on the day of trial, unprepared, expecting either a continuance or a release from his obligation to court and client. It was also quite reasonable and proper for the trial judge to recognize counsel's attempted withdrawal as a device to force a postponement of the trial. (Compare *People v. Douglas,* 61 Cal.2d 430 [38 Cal.Rptr. 884, 392 P.2d 964].)

Defendant argues here that he was denied his constitutional right to represent himself, citing *People* v. *Mattson,* 51 Cal.2d 777 [336 P.2d 937]. But Collins (unlike Mattson) never told the trial court that he wished to represent himself. What Collins was seeking was a postponement of the trial, not the opportunity to represent himself in propria persona. The trial court's rulings were a proper exercise of its discretion.

## The Conduct of the Prosecutor

Leon Jones, an accountant, had been employed by the receiver for Pacific. In this capacity Jones had audited Pacific's customer accounts, and was used as a witness by the prosecution to testify as to matters discovered in this audit. In January or February 1963 Jones had spent some time going over some records with Collins, and the latter had agreed to

pay Jones for his time in doing this. A few days later Jones sent Collins a bill for $112. Several reminders of the balance due were sent to Collins subsequently but the bill remained unpaid. On June 18, 1963, during the trial, Collins telephoned Jones to ask him to bring certain files to court, and Jones mentioned that the $112 had not been paid. Collins said he would pay. As of this time Jones was expected to be called as a witness for the People, but had not yet testified. On June 20 Jones came to the courtroom. During the mid-morning recess Collins handed to Jones a paper which was folded twice. It proved to be a check signed by Margaret Collins, with the date, payee and amount blank. Collins told Jones to fill it in for whatever the amount due might be. Mr. Jones' son was present at the time and heard Collins say: "I don't want the judge to see me giving you this."

Testimony concerning this incident was received in evidence over defendant's objection, as tending to show an effort by defendant to influence the testimony of Mr. Jones, indicating a consciousness of guilt on defendant's part. (See *People* v. *Weiss*, 50 Cal.2d 535, 554 [327 P.2d 527].) Defendant's counsel now points to the fact that Mr. Jones testified, on cross-examination, that he did not consider the blank check as anything other than payment of a legitimate debt, and that Collins had never tried to influence his testimony. Defendant's argument is that no inference of consciousness of guilt could have been drawn and that the prosecutor offered the evidence in bad faith. We think it was within the trial court's discretion to admit the evidence and it was for the jury to say what inference, if any, was to be drawn.

■ Defendant contends that the prosecutor was guilty of misconduct in calling Frank Mueller as a witness. Mr. Mueller was asked two questions. The first was whether he had been employed by Pacific in 1960, to which the witness answered "Yes." The second question was whether he had been "instructed by Mr. Collins or any person to forward the voucher forms attached to a check to Blanket & Katz and retain the original check without issuing it." The witness replied "I refuse to answer because my answer may tend to incriminate me." Defendant's attorney asked to "have the jury instructed that they may not consider the invocation of the privilege of the Fifth Amendment for any purpose of evidence in this case." The court thereupon advised the jury that "Mr. Mueller having invoked the Fifth Amendment is not to be considered by you in any way upon the issue of the innocence or the guilt of Mr. Collins. . . ."

Defendant now contends that the prosecutor called Mr. Mueller in bad faith, knowing that he would refuse to testify. The record does not bear this out. Just before Mr. Mueller was called a conference was held in chambers, at which an attorney representing Mueller stated that he desired to advise his client when to invoke the privilege, "depending upon the questions asked." The court then instructed this attorney to stand beside Mueller during his testimony so as to be able to give advice as the questions were asked. The implication was that Mueller would be willing to testify on some subjects. Nothing in the record indicates that the prosecutor expected Mueller to refuse to answer when he did. The subject of the question was hardly controversial. Mr. Katz, of Blanket & Katz, an accounting firm retained by Pacific during its operation, testified that it was a common practice of Pacific to draw checks, send the voucher forms to Blanket & Katz to be entered in the books, but hold the original check until there was money in the bank to cover it. The question put to Mueller was apparently preliminary to some further testimony which the prosecutor desired to elicit, but could not in the face of the witness' refusal. The record does not support the charge of misconduct.

The other claim of misconduct is that Witt testified that in the course of a conference among the defendants during the previous trial, Collins had said "that the blame should be laid at Mr. Mueller's door because he was the responsible party for this." That testimony was received as showing consciousness of guilt on the part of Collins. Counsel cites no authority in support of his contention that it was improper to elicit this testimony. There was no error or misconduct.

No good purpose could be served by reciting here all of the other contentions made by defendant's counsel concerning the trial court's rulings on objections to testimony. We find no ground of reversal in any of them.

### The Sentence

The remaining points have to do with the sentence which was imposed and the order granting probation. The court sentenced defendant to state prison for the term prescribed by law in each count, the sentences on counts I through IV to run concurrently with each other, and the sentences on the remaining counts to run concurrently with each other but consecutively to the term in counts I through IV. Execution of the sentences was suspended and defendant was placed on probation for a period of 15 years.

■ The 15-year probationary term is not excessive because Penal Code section 1203.1 allows probation not exceeding the maximum term of imprisonment. Defendant was given two consecutive terms for grand theft, for which the maximum is 10 years each. (Pen. Code, § 489.)

■ Contrary to defendant's contention Penal Code section 654 does not preclude sentencing him upon the conspiracy count as well as upon the six theft counts. This is because the conspiracy which was alleged and proved had objectives going beyond the six thefts for which defendant was convicted. (*People* v. *Scott,* 224 Cal.App.2d 146 [36 Cal.Rptr. 402] ; see *In re Cruz,* 64 Cal.2d 178, 180-181 [49 Cal.Rptr. 289, 410 P.2d 825].)

■ We find no validity in defendant's final protest that the portion of the probation order which calls for restitution is "void for uncertainty." The language which defendant objects to is that found in many probation orders, requiring, as one of the conditions, that the defendant make restitution "in such amounts and manner as such [Probation] Officer shall prescribe." Restitution means the amount which is due under the law. The provision giving the probation officer supervision over the "amounts and manner" is for defendant's benefit, to allow some leeway if he is unable to pay in full. This is a proper order under Penal Code section 1203.1.

Counsel for defendant has apparently forgotten that at the time of arraignment for judgment he said to the court: "Allow him to go on probation. Allow him to make restitution as the Probation Officer or the Court deems fit." When the court announced the terms of probation, defendant gave no indication that he considered the order uncertain or otherwise improper.

The judgment is affirmed.

Jefferson, J., and Kingsley, J., concurred.

A petition for a rehearing was denied June 22, 1966, and appellant's petition for a hearing by the Supreme Court was denied August 24, 1966. Mosk, J., did not participate therein. Peters, J., was of the opinion that the petition should be granted.