[Crim. No. 9025.   Second Dist., Div. Two.   Jan. 20, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. JAKE CHARLES SCOTT et al., Defendants and Appellants.

Claude Vibart Worrell, Sr., for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

FOX, P. J.—Defendants were convicted of a conspiracy to violate sections 4227[1] and 4230[2] of the Business and Profes-

[1]Furnishing dangerous drugs except upon prescription.
[2]Possession of dangerous drugs without prescription.

sions Code, in violation of section 182, Penal Code, between April 4, 1962 and November 14, 1962. Three overt acts were alleged:

1. On or about April 4, 1962, defendant Brown sold a quantity of seconal.

2. On or about May 11, 1962, both defendants were in possession of seconal and amphetamine.

3. Defendant Scott sold a quantity of seconal and amphetamine, on or about October 8, 1962.

Deputy Sheriff Burley was assigned to the narcotics detail and was working as an undercover agent on April 4, 1962. He was working with other narcotics officers. They were stationed where they could observe apartment 6 in an apartment house located at 13519 South Avalon. During the afternoon they observed some 11 people visit this apartment. Each remained approximately 10 minutes.

Officer Burley, in plain clothes, together with another person, visited the apartment. They were admitted by defendant Brown who was with a Negro woman. Both Burley and his companion made separate requests to Brown for a roll of "reds."[3] Brown nodded to the woman and said: "She will get them for you." Each gave the woman $1.00 for a packet of seven capsules. She went into the southwest bedroom to get the capsules. When she entered that room the officer observed that defendant Scott was there in bed. Search of the apartment yielded a quantity of white tablets and red capsules. The red capsules contained seconal and the white tablets were benzedrine.

Deputy Sheriff Savage testified that he kept this apartment under surveillance on this particular day and observed 27 people enter it. A number of them had money in their hands when they entered.

On May 11, 1962, one James Gray, working with Officer Scriven, purchased seven red capsules. Upon searching the apartment the officers found a quantity of white tablets and red capsules. The capsules were seconal and the tablets amphetamine. While the officers were there, defendant Scott entered the apartment.

On July 16, 1962, Officer Miller with other officers entered apartment 3 in this apartment house. Both Scott and Brown were there with an unidentified Negro woman. Search of the premises revealed four bags of pills and capsules. One

---

[3]In the vernacular of the drug traffic the term "red" means red seconal capsules.

bag contained 1,500 tablets. Two bags each contained 500 tablets of amphetamine. The fourth bag had 1,000 red capsules of seconal.

On September 28, 1962, Officer Greene (working as an undercover agent) went to this apartment with two Negroes at about 10:30 p.m. Brown received them. The officer asked for ''whites.'' Brown went to the kitchen and returned with two tinfoil packets containing amphetamine tablets. The officer gave Brown $2.00. Scott was in the room during this transaction.

This same undercover officer returned to this apartment in the afternoon of October 1, 1962. After a brief conversation at the door, the officer asked Brown for ''two.'' Brown went to the kitchen and returned with capsules that contained seconal for which the officer paid him $2.00. Scott was present and spoke up, saying, ''After this you will have to buy five.'' The officer then suggested that Scott procure for him a jar of pills. Scott explained that he could not get the officer a jar because he had to go to Las Vegas for his pills and the officer could not expect him (Scott) to lay his car on the line.

Officer Greene returned to defendant's apartment the next day, October 2, 1962, still in undercover dress, and again purchased from Brown a quantity of seconal tablets. The officer on this occasion had a conversation with Brown about Scott in which the latter was referred to as the big man.

Greene returned on October 3 and purchased some ''whites'' (seconal) from Brown for which he paid $6.00.

The officer returned to defendant's apartment on October 5. He was admitted by Brown and told Brown he wanted to talk to the big man. Scott, who was there, spoke up, saying: ''I don't know what I can tell you that he can't tell you.'' Greene then asked Scott when he was going to make another trip to Las Vegas: that he wanted Scott to get him a jar. Scott replied: ''The best I can do for you is to give you a deal on 10 or more. I will give you an extra roll.'' Greene agreed and started to give Scott $10 when there was a knock on the door and Scott gestured to him to put away his money. After the knock on the door, two Los Angeles policemen entered. The police officers arrested Brown and Scott. They acted on information received from Barbara Cox that dangerous drugs were being sold at that apartment.

When the officers knocked and Brown opened the door, one of the officers said he wanted to talk to the man of the house.

Scott then spoke up, asking the officer what he wanted. The officer told Scott he had information that dangerous drugs were being sold there. Scott replied that he did not know anything about any dangerous drugs and when the officer asked to look around, Scott said to go right ahead. The officer found two bags of pills and capsules where the informant, Barbara Cox, had said they would be.

Following the arrest of defendants on October 5, plain clothes deputy, Greene, went back to the apartment on October 8. After being admitted by a Mr. Wright, he walked over to Scott and discussed with him the events that occurred during the arrest on the 5th. Greene then asked Scott for "two reds" and "two whites" and gave Scott $4.00. Scott went over to the refrigerator area in the kitchen and got the pills and capsules. It was stipulated these items were dangerous drugs.

Other purchases of dangerous drugs were made from one or the other, or both, of the defendants on October 11, October 22, November 7 and November 9, 1962.

Defendants admitted they shared an apartment at 13519 South Avalon. They denied doing any business together. Scott said he did not know Brown's business. Scott claimed he did not sell any pills to Officer Greene. He claimed he gambled with Greene on three or four occasions but denied any other contact with him. Brown said he went to live with Scott on April 4, 1962, and that he had no employment from that date until he was arrested in October.

Defendants also presented certified copies of municipal court records showing: (1) that Brown had been convicted of violating Business and Professions Code, section 4230 (possession of dangerous drugs) on April 4, 1962; and (2) Scott had been acquitted of possession of dangerous drugs in violation of the same code section on May 11. The trial court then advised the jury not to consider defendant Scott in possession of dangerous drugs on May 11, 1962, as alleged in overt act number 2.

■ The pertinent principles relative to criminal conspiracy were recently stated by this court in *People* v. *Causey*, 220 Cal.App.2d 641, 653-654 [34 Cal.Rptr. 43] as follows: "The gist of a criminal conspiracy is a corrupt agreement of two or more persons to commit an offense prohibited by statute, accompanied by some overt act in furtherance of the objects of the agreement. [Citations.] ■ The existence of the conspiracy may be established by circumstan-

tial evidence. [Citation.] ■ The agreement may be inferred from the acts and conduct of the defendants in mutually carrying out a common purpose in violation of the statute [citations], but it need not be shown that the parties met and agreed to undertake the unlawful acts. [Citation.] ■ It is not necessary that the overt acts be criminal. [Citation.] If such acts are done as a step toward the furtherance of the conspiracy they are sufficient. [Citation.] ■ The overt act may be performed by only one of the conspirators and yet be sufficient, for the members of the conspiracy are bound by all acts of all members done in furtherance of the agreed plot. [Citations.] ■ Finally, once the conspiracy is established all evidence of the substantive crimes becomes admissible against all participants, even though the other conspirators were not present. [Citations.]''

Applying these principles to the factual picture at hand it is quite apparent that a conspiracy was established. In fact, defendants do not seriously challenge the sufficiency of the evidence to support the verdicts and judgments.

Scott's position is that having been found not guilty of the substantive offense charged as overt act number 2, he should not be tried or punished for the conspiracy. Similarly, Brown contends that having been convicted of the substantive offense charged as overt act number 1, he may not be tried and punished for conspiracy.

■ The situation as to defendant Scott is very simple. The People, in addition to establishing the conspiracy between him and Brown, also established overt act number 3. Only one of the alleged overt acts need be established. (*People* v. *Garrison,* 80 Cal.App.2d 458, 463 [181 P.2d 738]; *People* v. *Buono,* 191 Cal.App.2d 203, 222 [12 Cal.Rptr. 604].) ■ It was, however, but one of a series of acts committed in furtherance of the conspiracy to traffic in dangerous drugs as is apparent from the statement of facts. These other incidents were of course relevant and admissible in evidence to aid in establishing the conspiracy. (*People* v. *MacKenzie,* 144 Cal.App.2d 100, 106 [300 P.2d 700]; 11 Cal.Jur.2d § 29, p. 248.) ■ Thus Scott's guilt is established without reference to overt act number 2. It will be recalled that the judge advised the jury, in effect, not to consider Scott to have been in possession of the designated drugs as alleged in overt act number 2.

■ With respect to Brown we must point out that: (1) the conspiracy with Scott to traffic in dangerous drugs was

established; (2) overt act number 3, as well as numerous other similar incidents in which both men were involved, was established; and (3) each member of a conspiracy is responsible for the acts of other members done in furtherance of the agreed plot even though not present. Applying these principles to our factual situation, it is apparent that Brown's guilt is established.

Brown, however, contends that because he was formerly convicted of the substantive offense involved in overt act number 1, his present conviction cannot be upheld. He bases his contention on *People* v. *Keller,* 212 Cal.App.2d 210 [27 Cal.Rptr. 805], which takes the position that one cannot be punished both for the conspiracy and the substantive offense which is the object of the conspiracy because that would amount to double punishment in violation of Penal Code section 654. We believe that his reliance upon the principle of the *Keller* decision is misplaced when applied to the facts of the instant case.

The principle enunciated in *Keller* is that where there is a *single* transaction which is the object of the unlawful agreement, the conspiracy and the substantive offense cannot be punished separately. It is, in effect, a "single transaction" limitation. The present information, however, charges a single conspiracy covering a period of months with allegations of three separate and distinct overt acts, as well as proof of numerous other incidents, as evidence of that conspiracy. The "one objective" test which, according to *Keller,* involves double punishment, by definition cannot apply where, as in the instant case, there are multiple objectives or transactions. Logic suggests a contrary result, for to give effect to this argument would allow persons who conspired to commit 10 different robberies to escape punishment for the conspiracy upon being tried for one of the robberies. The rationale of the *Keller* case is to prohibit double punishment where, to continue the analogy, the objective of the conspiracy was to commit only one robbery and there was a trial for that particular offense.

The purported appeals from the orders denying defendants a new trial are dismissed. (Pen. Code, § 1237.)

The judgment as to each defendant is affirmed.

Herndon, J., and Roth, J., concurred.