[No. B007895. Second Dist., Div. One. Apr. 29, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
WENDELL CORREY JONES, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to rule 976 of the California Rules of Court, parts I-V and VIII of this opinion are not published, as they do not meet the standards for publication.

510

COUNSEL

Roger J. Rosen and David M. Dudley for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Susanne C. Wylie and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SPENCER, P. J.—**

### INTRODUCTION

Defendant Wendell Correy Jones appeals from a judgment of conviction entered after a jury trial. Defendant was convicted of kidnapping (Pen. Code, § 207), robbery (Pen. Code, § 211), and conspiracy to commit robbery (Pen. Code, § 182). The jury found true the allegations a principal was armed with a handgun in the commission of the robbery and conspiracy (Pen. Code, § 12022, subd. (a)). Defendant was sentenced to state prison for the term prescribed by law.

### STATEMENT OF FACTS

Late in the evening on September 21, 1982, defendant, his codefendant Jeffrey E. Brown (Brown), Winfred London (London) and Jay Clayton (Clayton) were at defendant's house in Los Angeles. The four decided to

drive to Compton to steal an automobile. Clayton had a 1972 brown or rust-colored Monte Carlo, which they drove to Compton; prior to leaving, Clayton removed a handgun from the engine compartment of the automobile and placed it under the dashboard.

As they drove around Compton, they observed Shawn Williamson (Williamson) getting into his Chevrolet Impala, which was parked in his driveway. Clayton said, "Let's get him." They drove past Williamson's house, then followed him when he left in his Impala.

Williamson observed the Monte Carlo pass his house. He left the house, headed for a gas station and again saw the Monte Carlo as he was driving. He pulled into a gas station on Wilmington Avenue and began pumping gas into his automobile; the Monte Carlo parked across the street on Wilmington.

As Williamson pumped gas into the Impala, Clayton approached him; Williamson recognized Clayton as someone he had seen several times before and knew Clayton's name. Clayton asked for the keys to the Impala, but Williamson said, "No." Clayton revealed a gun in the waistband of his pants, then two men came up behind Williamson; one put a gun to Williamson's head and the other to Williamson's back. Williamson gave the keys to Clayton. Williamson recognized one of the two men with Clayton as Brown and subsequently identified the other as London. Defendant remained in the Monte Carlo.

Brown and London put Williamson in the Impala, while Clayton finished pumping gas into the automobile. Clayton got in and they left the gas station, driving north on Wilmington Avenue; Brown was behind the wheel, Williamson in the front passenger seat, and Clayton and London in the back.

As they left, the Monte Carlo pulled away from the curb and began following them; both vehicles were in the lane closest to the center of the street. At the intersection of Wilmington Avenue and Compton Boulevard, the Impala stopped for a red light. In the left turn lane of Compton Boulevard westbound, there was a Compton police vehicle. The Monte Carlo pulled alongside Williamson's Impala at the intersection, shielding the Impala from police view. At this time, Williamson saw the driver of the Monte Carlo, who looked to him like defendant.

The two automobiles remained side by side as they drove through the intersection, then the Monte Carlo dropped back and pulled behind the Impala again. They continued north on Wilmington Avenue, then turned west on El Segundo Boulevard, headed toward the Harbor Freeway. As they drove, Clayton told Williamson that if he wanted his automobile back, he should give Clayton his telephone number; Williamson complied.

Near the entrance to the Harbor Freeway, Brown told Williamson he should have killed him. Williamson waited until the Monte Carlo pulled in front of them in order to enter the freeway; then he jumped out of his automobile. He was afraid of what might happen if he remained in the Impala while it was on the freeway, but he waited until the Monte Carlo passed him so it could not run him down. Both automobiles drove onto the freeway.

Williamson reported the incident to the police. Two days later, Clayton telephoned him and told him where to find his automobile; Clayton told him that certain items were being removed from the automobile. Williamson went to the location, and the police already were there; they impounded the vehicle. The missing items included hydraulic lifts, rims known as "true rays," the moon roof and radio.

Clayton subsequently was killed. Victor Steward (Steward) had sold Clayton a 1973 Chevrolet and kept the pink slip on the vehicle as security. After Clayton died, Steward repossessed the vehicle. When he retrieved the Chevrolet, he discovered hydraulic lifts had been installed on it; Williamson identified these as the ones taken from his Impala.

Detectives Michael McCravy and Tommy Martinez, Sheriff's deputies for Los Angeles County, investigated the case. They recovered the hydraulic system from Steward after Williamson identified it. Steward told them he was glad to be rid of the lifts—they had been nothing but trouble. Steward said defendant and Brown had been threatening him, saying the lifts belonged to defendant, who wanted them back. Steward described a particular encounter with Brown, who told him he would be asking for trouble if he did not return the hydraulic system to defendant.

### PROCEDURAL HISTORY

Defendant and Brown originally were charged with the crimes by separate informations. Pursuant to the People's motion, their cases were consolidated for trial.

As part of a plea bargain in this and another case, London agreed to testify in the matter. At trial, he testified he did not accompany defendant, Brown and Clayton into Compton that night, but was left behind by them at defendant's house. Two statements he gave to Detectives McCravy and Martinez describing the events were the result of beatings at their hands; they read a police report to him and he repeated what they said.

Detective Martinez denied this occurred. He testified as to London's first statement to him; a tape recording of the second statement was played for the jury.

CONTENTS

I

Defendant contends the trial court erred in consolidating his case with Brown's.

II

Defendant also contends the trial court erred in allowing Williamson to speculate that defendant drove the Monte Carlo alongside Williamson's Impala to prevent the police from observing the vehicle.

III

Defendant asserts the trial court erroneously allowed Detective Martinez to testify that defendant made several threats to Steward.

IV

Defendant further asserts he was prejudiced by Detective Martinez' testimony as to London's statement, in that the jury also heard a tape recording of the statement; the testimony was cumulative and placed an undue emphasis on London's statement.

V

Defendant additionally contends the trial court erred in instructing the jury to determine whether he was armed during the commission of the crimes when there was no evidence he was so armed.

VI

Defendant avers the trial court should have instructed the jury sua sponte that they were required to agree upon the overt act committed in furtherance of the conspiracy.

VII

Defendant also avers there is insufficient evidence to support his conviction of conspiracy to commit robbery.

VIII

Defendant finally contends he was denied the effective assistance of counsel.

DISCUSSION

I-V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

VI

■ Defendant avers the trial court should have instructed the jury sua sponte that they were required to agree upon the overt act committed in furtherance of the conspiracy. We cannot agree.

Where a defendant is prosecuted for violation of a statute under which any of several different acts would constitute the offense, the jury must be instructed they must agree on at least one of the acts committed by the defendant which constitutes the offense. (*People* v. *Failla* (1966) 64 Cal.2d 560, 568 [51 Cal.Rptr. 103, 414 P.2d 39]; *People* v. *Castro* (1901) 133 Cal. 11, 13 [65 P. 13]; *People* v. *Williams* (1901) 133 Cal. 165, 168 [65 P. 323]; *People* v. *Epps* (1981) 122 Cal.App.3d 691, 701 [176 Cal.Rptr. 332]; *People* v. *Madden* (1981) 116 Cal.App.3d 212, 216 [171 Cal.Rptr. 897].) However, the jury need not agree on the "theory" of the crime, the reason why the act is unlawful. (*Failla, supra,* at pp. 567, 569.) Thus, for example, where a defendant is charged with burglary, which requires an unlawful entry with the intent to commit a felony or theft, the jurors need only be unanimous in finding that a felonious entry took place, not the particular felony intended. (*Id.,* at pp. 568-569.)

In the case of conspiracy, Penal Code section 182 provides: "If two or more persons conspire: [¶] 1. To commit any crime. . . . They are punishable [by one of the listed punishments]." Section 184 provides: "No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement . . . ."

■ The elements of conspiracy are most often defined as (1) an agreement to commit a crime, and (2) an overt act done in furtherance of the agreement. (See *People* v. *Cockrell* (1965) 63 Cal.2d 659, 667 [17 Cal.Rptr. 788, 408 P.2d 116], cert. den. (1967) 389 U.S. 1006 [19 L.Ed.2d 604, 88 S.Ct. 568]; *People* v. *Bratis* (1977) 73 Cal.App.3d 751, 765 [141 Cal.Rptr. 45]; *People* v. *Earnest* (1975) 53 Cal.App.3d 734, 745 [126 Cal.Rptr. 107]; *People* v. *Scott* (1964) 224 Cal.App.2d 146, 150 [36 Cal.Rptr. 402].) While the overt act is considered an element of the crime, it need not be committed

---

[1] See footnote, *ante,* page 509.

by the defendant, but may be committed by any of the conspirators (*People v. Robinson* (1954) 43 Cal.2d 132, 140 [271 P.2d 865]; *Earnest, supra,* at p. 745; *Scott, supra,* at p. 151) and it need not be criminal in nature, so long as it is done in pursuit of the conspiracy (*Robinson, supra,* at pp. 139-140; *Scott, supra,* at p. 151).

The purpose of the overt act requirement is to allow the conspirators the opportunity to reconsider their agreement and terminate it to avoid punishment for conspiracy. (*People v. Zamora* (1976) 18 Cal.3d 538, 549, fn. 8 [134 Cal.Rptr. 784, 557 P.2d 75]; *People v. Olson* (1965) 232 Cal.App.2d 480, 490 [42 Cal.Rptr. 760]; see *United States v. Britton* (1883) 108 U.S. 199, 204-205 [27 L.Ed. 698, 699-700, 2 S.Ct. 531].) The overt act also must be proved "in order to show that an indictable conspiracy exists," in that "evil thoughts alone cannot constitute a criminal offense." (*Olson, supra,* at p. 489.)

There are cases, however, which specify it is the agreement itself which constitutes a punishable conspiracy; the overt act merely establishes the legal existence of a criminal conspiracy. (See, e.g., *People v. Moran* (1958) 166 Cal.App.2d 410, 414 [333 P.2d 243]; *People v. Goldberg* (1957) 152 Cal.App.2d 562, 568 [314 P.2d 151]; see also *People v. Samarjian* (1966) 240 Cal.App.2d 13, 17 [49 Cal.Rptr. 180].) This conclusion is logical in light of the stated purposes for requiring the overt act: allowing termination of the agreement to avoid punishment and requiring proof of an intent to act on the evil thoughts harbored by the conspirators. It also is logical in light of the Penal Code, which in section 182 provides punishment for conspiracy and in section 184 provides an *agreement* amounts to a conspiracy when the overt act is done. Thus, *People v. George* (1968) 257 Cal.App.2d 805, 808 [65 Cal.Rptr. 368] concludes: "In a conspiracy, the agreement to commit an unlawful act is not criminal until an overt act is committed, but when this happens and the association becomes an active force, it is the *agreement,* not the *overt act,* which is punishable. . . . (See *People v. Corica* [1942] 55 Cal.App.2d 130, 134 . . .; 1 Witkin, Cal. Crimes (1963) § 119, pp. 111-112.)" (Italics original.)

Inasmuch as the overt act, though required to establish the existence of a conspiracy, is not an actual element of the crime, it follows that the jury only need be unanimous in finding *an* overt act was done in furtherance of the conspiracy, not in finding a particular overt act was done. (*People v. Failla, supra,* 64 Cal.2d at pp. 568-569.) Inasmuch as the overt act need not actually be illegal or committed by the defendant, it is not a specific act committed by the defendant as to which the jury must agree. (*Id.,* at p. 568.) Hence, the overt act is part of the "theory" of the case, not an act constituting the offense. (*Id.,* at pp. 567-569.) For the foregoing reasons, we hold a trial court need not instruct the jury they must unanimously agree

as to the overt act done in pursuance of a conspiracy. Accordingly, there was no error here.

## VII

■ Defendant also avers there is insufficient evidence to support his conviction of conspiracy to commit robbery. Again, we disagree.

Defendant acknowledges there is sufficient evidence to support a conviction of conspiracy to commit grand theft of an automobile: When he, Brown, London and Clayton were at defendant's house, they agreed to drive to Compton to steal an automobile. But, defendant points out, there was no indication violence would be involved until after the agreement had been entered into—when Clayton put the handgun under the dashboard of the Monte Carlo.

■ To sustain a conspiracy conviction, there must be proof of specific intent to commit the offense which is the subject of the conspiracy. (*People* v. *Backus* (1979) 23 Cal.3d 360, 390 [152 Cal.Rptr. 710, 590 P.2d 837]; *People* v. *Horn* (1974) 12 Cal.3d 290, 296 [115 Cal.Rptr. 516, 524 P.2d 1300].) The existence of the conspiracy "may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding so as to accomplish the act and unlawful design." (*People* v. *Fain* (1971) 18 Cal.App.3d 137, 144 [95 Cal.Rptr. 562].) Thus, "'[d]irect proof of a formal understanding between parties to the conspiracy is not required as the basis of an indictment or information. It was not necessary for the State to prove that the parties actually came together, mutually discussed their common design and after reaching a formal agreement, set out upon their previously agreed course of conduct. The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime, usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts of the same complete whole.'" (*People* v. *Britz* (1971) 17 Cal.App.3d 743, 751 [95 Cal.Rptr. 303], citations omitted.)

■ A conspiracy is not necessarily a single event which unalterably takes place at a particular point in time when the participants reach a formal agreement; it may be flexible, occurring over a period of time and changing in response to changed circumstances. Thus, in *People* v. *Mares* (1975) 51 Cal.App.3d 1013 [124 Cal.Rptr. 718], where the question was whether the conspiracy was one to commit robbery in the first or second degree, the court noted: "Whatever the original discussions may have encompassed, the conspiracy did not become frozen in its character, but remained alive until it was frustrated; its final character, so far as the degree of the intended

robbery was concerned, depended upon all the circumstances manifesting themselves during the life of the conspiracy and could only be determined in retrospect." (At p. 1019.)

 In the instant case, there was initially, defendant admits, a positively stated agreement to go to Compton to steal an automobile. When Clayton placed the handgun under the dashboard of his Monte Carlo without objection from the other conspirators, there may have been a tacit agreement violence might be used in the commission of the crime. As the four drove past Williamson's house, they saw Williamson getting into his automobile in the driveway, and Clayton said, "Let's get him." None of the other conspirators objected, and they subsequently followed through on Clayton's suggestion to "get" Williamson.

These facts show the nature of the conspiracy changed from a positive agreement to steal an automobile to a tacit agreement to rob Williamson. The conspiracy did not become frozen in its character at the time the four entered into their original agreement, but remained alive and changing until the conspirators' goal was accomplished. (*Ibid.*) Hence, there is sufficient evidence to support defendant's conviction of conspiracy to commit robbery.

VIII*

. . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Lucas, J., and Boren, J.,† concurred.

---

*See footnote, *ante*, page 509.
†Assigned by the Chairperson of the Judicial Council.