Filed 8/21/25  In re N.M. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re N.M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> N.M., <br><br> Defendant and Appellant. | F088262 <br><br> (Super. Ct. No. JJD075161) <br><br> **OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Tulare County.  Sara Bratsch, Judge.

Arthur L. Bowie, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen and Charlotte Woodfork, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Snauffer, Acting P. J., DeSantos, J. and Fain, J.[†]

[†]    Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Minor N.M. contends on appeal that the juvenile court's jurisdictional findings and disposition order must be reversed because there is insufficient evidence to support its true findings on counts 7 through 9. The People disagree. We affirm.

**PROCEDURAL SUMMARY**

On September 13, 2023, a juvenile wardship petition was filed in Tulare County Superior Court, pursuant to Welfare and Institutions Code section 602, alleging minor committed vandalism (Pen. Code, § 594, subd. (a);[1] count 1).

On January 16, 2024, an amended juvenile wardship petition was filed, alleging minor committed vandalism (§ 594, subd. (a); count 1); first degree burglary (§ 459; count 2); attempting to drive or take a vehicle without consent (§ 664; Veh. Code, § 10851; count 3); driving or taking a vehicle without consent (Veh. Code, § 10851; count 4); receiving a stolen vehicle (§ 496d; count 5); petty theft (§ 484, subd. (a); count 6); conspiracy to drive or take a vehicle without consent (§ 182, subd. (a)(1); Veh. Code, § 10851; count 7); and conspiracy to commit first degree burglary (§§ 182, subd. (a)(1), 459; count 8).

On January 31, 2024, a second amended juvenile wardship petition was filed. On April 17, 2024, the second amended petition was orally amended by the prosecution. As amended, it was alleged minor committed felony vandalism (§ 594, subd. (a); count 1); first degree burglary[2] (§ 459; count 2); attempted driving or taking a vehicle without consent[3] (§ 664; Veh. Code, § 10851, subd. (a); count 3); driving or taking a vehicle without consent[4] (Veh. Code, § 10851, subd. (a); count 4); receiving a stolen vehicle (§ 496d; count 5); petty theft (§ 484, subd. (a); count 6); conspiracy to drive or take a

---

[1] All statutory references are to the Penal Code unless otherwise noted.

[2] The victim in count 2 was Jonathan K.

[3] The victim in count 3 was Jonathan.

[4] The victim in count 4 was Darla G.

vehicle without consent (§ 182, subd. (a)(1); Veh. Code, § 10851, subd. (a); count 7); conspiracy to commit first degree burglary (§§ 182, subd. (a)(1), 459; count 8); and criminal threats (§ 422; count 9).[5]

On April 24, 2024, the juvenile court held a contested jurisdiction hearing. Minor admitted count 6. The court found true the remaining counts.

On June 5, 2024, the juvenile court adjudged minor a ward of the court pursuant to Welfare and Institutions Code section 602, subdivision (a). The court committed minor to 365 days in the Tulare County Mid-Term Program.

On June 25, 2024, minor filed a timely notice of appeal.

## FACTUAL SUMMARY[6]

### Darla G.'s Vehicle

At approximately 8:00 a.m. on December 19, 2023, Darla G. discovered her vehicle, a blue Hyundai Elantra, was missing from where she had parked it at her apartment complex. She testified she last saw her vehicle at approximately 7:00 p.m. the prior evening, December 18, 2023, when she parked it. The vehicle had Christmas gifts and her husband, Timothy G.'s, knife inside it. Darla called Timothy at work when she discovered it missing and he confirmed he did not have it. He did not realize it was missing until Darla called him.

At approximately 8:00 a.m., Porterville Police Department Officer Macklin Williams responded to Darla's call reporting her vehicle stolen. A resident of Darla's apartment complex spoke with Williams and showed him a recording from the apartment complex's security camera. Williams testified "the video from the apartment complex['s

---

[5]     The victim in count 9 was named as M.G. M.G. is also known as "Juan." The second amended petition also states the date of the incident underlying count 9 was December 24, 2023. However, the prosecution later orally amended the date to December 26, 2023.

[6]     We omit the facts underlying counts 1 through 6, as they are irrelevant to minor's appeal.

security camera] where [Darla's] vehicle was stolen from gave a pretty good view of the two [subjects] who [stole the vehicle] wearing really distinct, bright clothing."

Darla's vehicle was recovered later that morning at approximately 10:00 a.m. or 11:00 a.m. The windshield wipers had been broken off.

When Darla's vehicle was recovered later that day, Williams contacted Timothy. Williams testified that Timothy had obtained video clips posted to a social media application. The video clips were entered into evidence as exhibit 2. Williams testified that the video clips from the social media application showed "the two [subjects] that you could see in the video from the apartment complex['s security camera] driving and posing on top of [Darla's] vehicle."

Timothy testified that he posted messages online asking people to notify him if anyone saw Darla's missing vehicle. Through social media, Timothy obtained information that someone with the username "itz.noie_.15" posted photos and videos of himself and another subject to a social media platform taking Darla's vehicle, vandalizing it, and posing with Timothy's knife that had been in the vehicle. He identified minor in court as one of the subjects in the video clips with Darla's vehicle. Timothy identified the knife shown in the video as his knife that was in Darla's vehicle when it was taken.

On January 11, 2024, Williams was on patrol and noticed a group of three males walking down the street. He immediately recognized minor and one of the other males as the two subjects from the videos from Darla's apartment complex's security camera and the social media application video clips and photographs posted by "itz.noie_.15." Williams arrested them. He testified that they matched the suspects from Darla's apartment complex's security camera recording and the videos posted to social media "exactly."

*Defense*

Timothy testified on recross-examination that he thought he saw Darla's vehicle at their residence before he left for work at 4:00 a.m. on December 19, 2023, the morning it

4.

was discovered stolen, although he "didn't check completely but [he] thought [he saw it]."

### *Jonathan K.'s Vehicle and Residence*

At approximately 7:00 a.m. on January 11, 2024, Jonathan realized his residence had been broken into. He noticed a lot of mud on the ground. He also saw drawers in the living room and dining room were open. He found that his laptop computer, tablet, and wireless headphones were missing. He then went outside and noticed his vehicle had been broken into, and the steering column and ignition button were damaged.

At approximately 7:30 a.m. that morning, Porterville Police Department Officer Eduardo Mena was dispatched to Jonathan's residence regarding a possible burglary. At the residence, Mena found multiple muddy shoe prints and multiple open drawers inside and muddy shoe prints leading outside.

The shoe prints led from the residence to its carport and circled Jonathan's vehicle, a Honda, that was parked there. The steering and ignition column of the vehicle were damaged, indicating an attempt to steal the vehicle. A still photograph from the residence's security doorbell camera showed minor and another subject at Jonathan's door immediately before the doorbell camera was turned off completely. The photograph was entered into evidence as exhibit 4. After minor was arrested by Williams later that day in connection to taking Darla's vehicle, Mena identified minor as one of the subjects from the photograph from Jonathan's doorbell camera.[7]

The same day, Porterville Police Department Officer Andrew Hinojosa was investigating a vehicle burglary that had just occurred, when he heard the alarm of another vehicle going off. Hinojosa located the vehicle that had the alarm set off and saw two subjects attempting to get inside of it. The subjects were wearing hoodies and

---

[7]     It is unknown from the record whether the unidentified subject who was with minor during the attempted driving or taking of Jonathan's vehicle is the same subject who was with minor during the driving or taking of Darla's vehicle.

appeared to be approximately 18 to 20 years old. He attempted to detain the subjects but was unsuccessful. However, he located a laptop computer and tablet when retracing the subjects' route after they evaded him. The laptop computer and tablet were later identified as Jonathan's laptop and tablet that had been stolen from his residence that morning.

*Defense*

Mena testified that he took photographs of the shoeprints on his AXON mobile application when he was at Jonathan's residence on January 11, 2024, but was not aware that he was required to use a 35-millimeter camera or that the camera was supposed to be mounted on something stationary when he took the photographs so that it did not move while the photographs were taken. Mena also testified that the photograph from Jonathan's doorbell camera showed the subject he identified as minor wearing a black hoodie that covered part of his mouth and hair and was somewhat blurry. He also testified that his report stated he determined the subject in the photograph was minor because minor was wearing "Air Force 1" sneakers and because minor bore a strong resemblance to the subject in the photograph from the doorbell camera.

### Minor's Text Messages to A.G.

At approximately 12:00 p.m. on December 26, 2023, A.G. told her father, Juan G.,[8] "to watch [his] back because [minor] was going to kill [him]." Juan called the police to report the threat.

Tulare County Sheriff Deputy Guadalupe Beltran was dispatched to A.G.'s residence in response to Juan's report that A.G. received a threatening text messages from minor. Beltran determined when she arrived at Juan and A.G.'s residence that Juan was also threatened. Beltran testified that Juan told her A.G. received text messages stating, " 'I'm going to go to your house and kill your family and burn your house down.' "

---

[8]     Juan is identified in count 9 of the second amended petition as "M.G."

Juan stated A.G. did not show him the text messages, but A.G. showed them to Beltran, who took a photograph of them. The photograph of the messages, entered into evidence as exhibit 3, shows the following text message conversation between minor and A.G.:

"[AG]: ur gonna try to kill me
i already know
ur dumb add
asf[9]

"[N.M.]: Lmaoooo[10]
I'll kill ur whole family
B[****]"

When A.G. was shown the photograph of the text messages minor sent her, she testified she recognized the messages, and stated, "[minor] was probably mad so he said that." A.G. identified minor in court.

Juan testified that when A.G. told him of the messages, "I felt threatened. You know, [minor] threatened me and [A.G.] said I had to watch my back." He stated he took the threat seriously because "[f]irst [minor] threatened me, and then after that he went and threatened my daughter [A.G.]. That's what we got the texts from."

Juan stated that the first time he met minor was three to five months before minor sent the text messages, when he went to minor's residence to pick up A.G. because she failed to attend school that day. When Juan got there, minor "assaulted [him] and punched [him] in the face five times. That was the first time [he met minor], and [he] told [his] daughter you're going to break up with [minor] because [minor] hit me. And

---

[9]    "asf" is an abbreviation for "As f***." (<https://www.internetmatters.org/resources/text-dictionary/> [as of August 21, 2025], archived at <perma.cc/Y3YN-BF5T>.)

[10]    "Lmaoooo" is an abbreviation for "Laughing my a** off." (<https://www.internetmatters.org/resources/text-dictionary/> [as of August 21, 2025], archived at <perma.cc/Y3YN-BF5T>.)

right after that is when [minor] started making threats." He stated that prior to the assault, he had "no complaint" about A.G. dating minor, and that "[s]he was there approximately ever[y] single day, and just for us to avoid any argument or anything, [he and A.G.'s mother] let her go to [minor's] house." However, he stated that "after [minor] assaulted me, it just stopped everything." He stated A.G. and minor no longer had a relationship and he told her to stop sending text messages to minor, but he did not know if it stopped or not. He stated A.G. told him a couple of weeks before the jurisdictional hearing that minor was still texting her.

*Defense*

Beltran testified that A.G. did not appear to show any emotion when she spoke to her about the threat.

A.G. testified that she did not tell Beltran she received any text messages from minor threatening to kill her and her family. She stated her father "probably said that [to Beltran]." She testified she was not, and had never been, afraid of minor. She stated the text messages minor sent on December 26, 2023, did not frighten her. She testified that she did not have contact with minor, but she texted minor on the day of the jurisdictional hearing, April 24, 2024, at approximately 12:00 p.m., saying, " '[H]ey.' "

## DISCUSSION

### I.    COUNTS 7 AND 8

Minor contends there is insufficient evidence to support the juvenile court's finding in count 7 that he committed conspiracy to drive or take a vehicle without consent. He further contends there is insufficient evidence to support the court's finding in count 8 that he committed conspiracy to commit residential burglary. The People disagree. We agree with the People.

8.

### A.     Law

#### Sufficiency of Evidence

We review the minor's contentions using the same standard of review that applies in adult criminal cases. (*In re V.V.* (2011) 51 Cal.4th 1020, 1026.) "Specifically, we determine whether substantial evidence—'evidence that is reasonable, credible, and of solid value'—supports the juvenile court's findings. [Citation.] We view the evidence 'in the light most favorable to the prosecution and presume in support of the [findings] the existence of every fact the [court] could reasonably have deduced from the evidence.' [Citation.] We 'accept [all] logical inferences that the [court] might have drawn from the … evidence' [citation], but reject inferences ' "based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work[.]" ' [Citations.] We will reverse only if ' "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the [court's findings].' " (*In re I.A.* (2020) 48 Cal.App.5th 767, 778.) " ' "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends .…" ' " (*People v. Barnes* (1986) 42 Cal.3d 284, 303.) Although we review the whole record, "[t]he uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296; see *People v. Panah* (2005) 35 Cal.4th 395, 489.)

#### Conspiracy

A conspiracy consists of two or more persons conspiring to commit any crime. (§ 182, subd. (a).) "The elements of conspiracy are most often defined as (1) an agreement to commit a crime, and (2) an overt act done in furtherance of the agreement." (*People v. Jones* (1986) 180 Cal.App.3d 509, 515 (*Jones*).)

"Criminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy." (*People v. Morante* (1999) 20

9.

Cal.4th 403, 416–417.) "Conspiracy is a unique crime which 'attaches culpability at an earlier point along the continuum than attempt. "Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." ' [Citation.] 'Conspiracy separately punishes not the completed crime, or even its attempt. The crime of conspiracy punishes the agreement itself.' But an agreement to commit a crime does not, by itself, complete the crime of conspiracy. 'The commission of an overt act in furtherance of the agreement is also required.' " (*People v. Joseph* (2021) 63 Cal.App.5th 1058, 1065–1066.)

" ' " 'Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime." ' " [Citation.] "Evidence of an agreement does not require proof that the parties met and expressly agreed; a criminal conspiracy can be shown through circumstantial evidence." ' " " ' " ' "The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' " ' " (*People v. Lamb* (2024) 16 Cal.5th 400, 442.) "The agreement in a conspiracy may be shown by circumstantial evidence, including the conduct of the defendants in mutually carrying out an activity which constitutes a crime." (*People v. Consuegra* (1994) 26 Cal.App.4th 1726, 1734.)

" 'While it is true that mere association with the perpetrator of a crime does not prove criminal conspiracy, it is a starting place for examination.' " (*People v. Starski* (2017) 7 Cal.App.5th 215, 224.) "[W]here there is some evidence that a person participated in committing the target offense or had an interest in its commission, such evidence together with evidence of association can be sufficient to support an inference of a conspiracy to commit that offense." (*People v. Tran* (2013) 215 Cal.App.4th 1207, 1221–1222; see *People v. Cockrell* (1965) 63 Cal.2d 659, 667.) However, "[c]onspiracy … is not synonymous with aiding or abetting or participating." (*People v. Malotte* (1956) 46 Cal.2d 59, 65.) A person can aid and abet the crimes targeted by the conspiracy

without actually having committed the crime of conspiracy. (*People v. Huling* (1925) 71 Cal.App. 144, 146.) " ' "Conspiracy" implies an agreement to commit the crime, while to "aid and abet" requires actual participation in the act constituting the offense. It is therefore manifest that one may "aid and abet" without having previously entered into a conspiracy to commit the crime.' " (*Id*. at pp. 146–147.)

However, "[n]o agreement amounts to a conspiracy, unless some act, beside such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement …." (§ 184.) Further, "[w]hile the overt act is considered an element of the crime, it need not be committed by the defendant, but may be committed by any of the conspirators." (*Jones*, *supra*, 180 Cal.App.3d at pp. 515–516.) " 'Once one of the conspirators has performed an overt act in furtherance of the agreement, "the association becomes an active force, it is the agreement, not the overt act, which is punishable. Hence the overt act need not amount to a criminal attempt and it need not be criminal in itself." ' " (*People v. Joseph*, *supra*, 63 Cal.App.5th at pp. 1065–1066.)

"The purpose of the overt act requirement is to allow the conspirators the opportunity to reconsider their agreement and terminate it to avoid punishment for conspiracy. [Citations.] The overt act also must be proved 'in order to show that an indictable conspiracy exists,' in that 'evil thoughts alone cannot constitute a criminal offense.' " (*Jones*, *supra*, 180 Cal.App.3d at p. 516.) Thus, " '[i]n a conspiracy, the agreement to commit an unlawful act is not criminal until an overt act is committed, but when this happens and the association becomes an active force, it is the *agreement*, not the *overt act*, which is punishable…. [Citations.]' " (*Ibid*.)

### *Driving or Taking a Vehicle Without Consent (Veh. Code, § 10851, subd. (a))*

Vehicle Code section 10851, subdivision (a), " 'proscribes a wide range of conduct,' " including " 'taking a vehicle with the intent to steal it [and] driving it with the intent only to temporarily deprive its owner of possession (i.e., joyriding).' " (*People v. Garza* (2005) 35 Cal.4th 866, 876.) It provides, in pertinent part:

11.

"Any person who drives or takes a vehicle not his or her own, without the consent of the owner thereof, and with intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle, or any person who is a party or an accessory to or an accomplice in the driving or unauthorized taking or stealing, is guilty of a public offense .…" (Veh. Code, § 10851, subd. (a).)

### First Degree Burglary (§ 459)

Burglary is defined as: (1) entry into a structure, (2) with the intent to commit theft or any felony. (§ 459.) If, in addition to these elements, there is also proof that the structure was inhabited at the time of the entry, the crime is elevated from second degree to first degree burglary. (§§ 459, 460, subd. (a); *People v. Anderson* (2009) 47 Cal.4th 92, 101.)

### B. Analysis

Here, substantial evidence supports the juvenile court's findings that minor conspired with another subject in count 7 to drive or take a vehicle without consent and in count 8 to commit first degree burglary.

### Count 7 (Conspiracy to Drive or Take a Vehicle Without Consent)

Substantial evidence supports the juvenile court's finding in count 7 that minor committed conspiracy to drive or take a vehicle without consent (§ 182; Veh. Code, § 10851) when he and another subject took and drove Darla's vehicle on December 19, 2023, and when he and another subject attempted to drive or take Jonathan's vehicle on January 11, 2024.

In count 3, the juvenile court found true that minor committed the offense of attempted driving or taking Jonathan's vehicle without consent (§ 182; Veh. Code, § 10851, subd. (a)) and in count 4, found true that minor committed the offense of driving or taking Darla's vehicle without consent (Veh. Code, § 10851, subd. (a)). Minor does not contest the court's finding on counts 3 or 4.

12.

In count 7, the juvenile court also found true that minor committed conspiracy to drive or take a vehicle without consent by taking and driving Darla's vehicle and by attempting to take or drive Jonathan's vehicle. At the jurisdiction hearing, it stated,

> "THE COURT: Count 7, on or about December 18th, 2023, it is alleged [minor] committed the crime of conspiracy to commit a crime, in violation of … [s]ection 182[, subdivision ](a)(1), a felony. I think that is in connection to [Darla's vehicle,] the Hyundai Elantra. Is that accurate?
>
> "[PROSECUTION]: Your Honor, that charge covers a period of days from December 18th to January 11th. So it would have started with the—
>
> "THE COURT: The two separate vehicles?
>
> "[PROSECUTION]: Yeah. It would have included the December 18th vehicle … belonging to [Darla], the attempted taking of the vehicle belonging to [Jonathan], and could also—the vehicle that was also attempted to be taken when … Hinojosa found the two individuals [minor and another individual] who dumped [Jonathan's laptop computer] and [tablet].
>
> "THE COURT: In order for [minor] to be convicted of conspiracy, the People must prove that two or more people engaged or had an unlawful agreement, whether that's an express agreement or an implied agreement, to commit a felony, and certain overt acts be taken in furtherance of that felony.
>
> "The [security camera] shows, Number 1, that two or more people were present at the residence belonging to [Jonathan], and as well as in the video where [minor] was present with an unknown, unidentified co-conspirator within [Darla's] vehicle. So the Court does find true that [minor] was involved in a conspiracy, unlawful agreement to commit offense or offenses with an unknown person, and overt acts were taken in furtherance of that conspiracy."

Minor contends there is insufficient evidence of an agreement to support the juvenile court's true finding of conspiracy in count 7. He argues that "[t]o conclude that there was some kind of personal agreement between him and another … is pure speculation." Regarding the driving and taking of Darla's vehicle, he concedes "[t]he

13.

evidence may support the fact that he constructively possessed [Darla's] stolen vehicle as it was being driven," and regarding the attempted driving or taking of Jonathan's vehicle, further concedes that the evidence "may even further suggest that he was with another [subject] during the attempt[ to steal Jonathan's] vehicle … when he committed the residential burglary [of Jonathan's residence.]"  However, he argues there is "no evidence that the other person participated in any of those crimes or agreed to do so," because the evidence "showed only that [minor] was present, riding in a stolen vehicle."  Minor further contends that, "even if the evidence shows that there was another participant in any of the alleged offenses, a person can aid and abet the crimes targeted by the conspiracy without actually having committed the crime of conspiracy," because " ' "[i]t is … manifest that one may 'aid and abet' without having previously entered into a conspiracy to commit the crime."  [Citation.]' "

However, the record supports the juvenile court's reasonable inference, based on the conduct, relationship, interests, and activities of minor and another subject before and during the taking and driving of Darla's vehicle and the attempted taking or driving of Jonathan's vehicle that minor and another subject intended to agree to take and drive the vehicles and that minor or another subject committed overt acts to further their agreements to take or drive the vehicles.

First, circumstantial evidence supports the juvenile court's reasonable inference that there was an agreement, and not mere association, between minor and another subject to drive and take Darla's vehicle.  Williams testified that the security camera video recording from Darla's apartment complex showed minor and another subject at the apartment complex where Darla's vehicle was taken from, and the video clips from the social media application posted by "itz.noie_.15" show minor and the other subject taking turns driving Darla's vehicle and posing with Timothy's knife after it was taken.  This evidence showing minor and the other subject mutually carrying out the target offense of driving Darla's vehicle is sufficient to support the court's reasonable inference that minor

14.

and the other subject either positively or tacitly came to a mutual understanding to take and drive Darla's vehicle. The same evidence also shows minor and the other subject committed an overt act to further their agreement to drive and take Darla's vehicle, as the social media posts by "itz.noie_.15" show minor and the other subject taking turns driving the vehicle after it was taken while the other rides in the vehicle and records the video. Accordingly, there is substantial evidence that minor committed conspiracy to take and drive Darla's vehicle.

Further, the evidence is sufficient to support the juvenile court's reasonable inference that minor and another subject also intended to agree to take or drive Jonathan's vehicle and committed an overt act to further that agreement, supporting the court's finding that minor committed conspiracy to take Jonathan's vehicle. The photograph from Jonathan's doorbell camera shows minor and another subject at Jonathan's residence on the date of the burglary the moment before the camera was turned off. Further, Mena testified that there were two sets of muddy footprints leading from inside Jonathan's residence to his vehicle outside. Both sets of footprints continued around the vehicle, and the vehicle's ignition was damaged, showing an attempt to start it. The muddy footprints from the residence to the vehicle, the damage to the vehicle's ignition, and the photograph from the doorbell security camera showing minor and the other subject are substantial evidence that minor and the other subject came to a mutual understanding to attempt to take or drive Jonathan's vehicle and that one or both participated in overt acts to further the commitment of the target offense. This is substantial evidence that minor and the other subject had an agreement, and accordingly, is sufficient evidence that minor committed conspiracy to take or drive Jonathan's vehicle.

Accordingly, as we accept all logical inferences that the juvenile court might have drawn from the evidence, the evidence here is sufficient to support the court's finding in count 7 that minor committed conspiracy to drive or take a vehicle without consent.

15.

***Count 8 (Conspiracy to Commit the Crime of Residential Burglary)***

Here, there is also sufficient evidence to support the juvenile court's finding in count 8 that minor conspired to commit first degree burglary.

The juvenile court found in count 2 that minor committed first degree burglary when he entered Jonathan's residence on January 11, 2024. Minor does not appeal from the court's finding in count 2.

The juvenile court also found true in count 8 that minor committed conspiracy to commit first degree burglary. At the disposition hearing, the juvenile court stated:

> "The Court does find true on [c]ount 8, the same arguments that on or about January 11th, 2024, that [minor] committed … a crime of conspiracy to commit a crime, to wit: First-degree residential burglary. There were two or more people contained in that [security] camera, which does show that there was an implied agreement between two or more people to commit an unlawful act, to wit: The felony of first-degree residential burglary, and certain steps were taken in furtherance of that crime."

Minor contends there is insufficient evidence of an agreement to support the juvenile court's true finding of conspiracy in count 8. As stated above, he argues there is no evidence of an agreement between himself and another subject. He argues that while the evidence "may even further suggest that he was with another [subject] … when he committed the residential burglary [of Jonathan's residence]," there is "no evidence that the other person participated in any of those crimes or agreed to do so."

However, the evidence here is sufficient to prove minor and the other subject intended to agree to burglarize Jonathan's residence and that minor or the other subject committed an overt act to further their agreement to commit the burglary.

As discussed above, "[t]he agreement in a conspiracy may be shown by circumstantial evidence, including the conduct of the defendants in mutually carrying out an activity which constitutes a crime." (*People v. Consuegra*, *supra*, 26 Cal.App.4th at p. 1734.)

16.

Here, the photograph from Jonathan's doorbell security camera showing minor and the other subject both at the residence during the burglary and the two sets of muddy footprints inside Jonathan's residence show minor and the other subject mutually carried out activities constituting burglary by entering Jonathan's residence with the intent to commit theft or felony, taking his laptop and tablet, and attempting to take or drive his vehicle. The evidence of mutual participation supports the juvenile court's inference that minor and the other subject came to a mutual understanding, or agreement, to carry out the burglary, and that minor or the other subject committed an overt act to further the agreement. Accordingly, as we accept all logical inferences that the juvenile court might have drawn from the evidence, we conclude there is substantial evidence to support the court's finding in count 8 that minor committed conspiracy to commit first degree burglary.

Accordingly, we conclude sufficient evidence supports the juvenile court's findings in count 7 that minor conspired to take or drive a vehicle without consent and in count 8 that minor conspired to commit first degree burglary.

## II.     CRIMINAL THREATS

Minor also contends there is insufficient evidence to support the juvenile court's finding in count 9 that he made criminal threats against Juan. The People disagree. We agree with the People.

### A.     *Background*

At the disposition hearing, the juvenile court stated:

> "Count 9, on or about December 26th, 2023, the [c]ourt does find true that the [minor] committed the crime of criminal threats, in violation of … [s]ection 422[, subdivision ](a). A criminal threat is one in which the minor made a threat of great bodily injury or death. And that that threat was received by the victim and that that threat, although—that the threat of great bodily injury or death, that the victim reasonably was in sustained fear for his safety. The [minor] made that threat regardless of the intent to carry it out. And the [minor] presently was able to carry out the threat.

17.

"The father[, Juan,] testified that he had a previous altercation close in time with [minor], that [minor] assaulted him physically and injured him and, therefore, reasonably believed that [minor] making this threat would carry out the threat, and was in reasonable sustained fear for his safety."

## B.     Law

### Section 422

In order to prove a defendant has committed the crime of criminal threats, "the prosecution must establish all of the following:  (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement … is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, … so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228 (*Toledo*).)

" 'When a reasonable person would foresee that the context and import of the words will cause the listener to believe he or she will be subjected to physical violence, the threat falls outside First Amendment protection.' " (*Toledo*, *supra*, 26 Cal.4th at p. 233, italics omitted.)

" '[S]ection 422 authorizes only one conviction and one punishment per victim, per threatening encounter during which the victim suffers a single period of sustained fear.' [Citation.]  Sustained fear must occur over 'a period of time that extends beyond what is momentary, fleeting, or transitory.' " (*People v. Roles* (2020) 44 Cal.App.5th 935,

942.)  "In addition, sustained fear must be objectively and subjectively reasonable." (*Ibid*.)

"Section 422 does not in terms apply only to threats made by the threatener personally to the victim nor is such a limitation reasonably inferable from its language. The kind of threat contemplated by section 422 may as readily be conveyed by the threatener through a third party as personally to the intended victim.  Where the threat is conveyed through a third party intermediary, the specific intent element of the statute is implicated.  Thus, if the threatener intended the threat to be taken seriously by the victim, he must necessarily have intended it to be conveyed." (*In re David L.* (1991) 234 Cal.App.3d 1655, 1659.)

### C.     Analysis

Here, there is sufficient evidence to support the juvenile court's finding in count 9 that minor made a criminal threat against Juan when he texted A.G., Juan's daughter, threatening to kill their entire family, which A.G. then conveyed to Juan.  The record further supports the court's reasonable inference that minor intended for A.G. to convey the messages to Juan and that he intended for Juan to take his statements as a threat.

Minor does not dispute that by telling A.G. he would "kill [her] whole family [¶] B[****]," he willfully threatened to commit a crime which would result in death or great bodily injury to another person.  (See *Toledo*, *supra*, 26 Cal.4th at pp. 227–228.)  Minor also does not dispute that the threat actually caused Juan " 'to be in sustained fear for his … own safety or for his … immediate family's safety .…' " (*Ibid*.)

However, minor contends he did not make the statement that he would kill A.G.'s whole family with the specific intent that the statement was to be taken as a threat by Juan, even if there is no intent of actually carrying it out.  He argues the conversation between he and A.G. shows his messages were "banter" with A.G. and that the statement was made "in jest" to one-up her after she told him he was "dumb" "asf."  He contends that because he stated he was laughing his a** off immediately after she told him he was

19.

"dumb," A.G. and minor were "joking around." Minor further contends that minor did not intend for A.G. to convey the threat to Juan, as there is no evidence that minor instructed or intended for A.G. to convey the messages to Juan. He argues the text messages were directed solely to A.G., and not to Juan and that the circumstances show A.G. chose to convey the threat to Juan "to get under his skin rather than to pass a threat on to him from [minor]."

However, substantial evidence shows that minor intended the threat to be taken seriously by the victim, Juan, and accordingly, must necessarily have intended it to be conveyed to him. First, the record does not show the messages were merely "banter." A.G. did not make any humorous references during the conversation. Nothing in A.G.'s messages indicate she was engaging in "banter." Rather, she stated to minor, "ur gonna try to kill me [¶] i already know [¶] ur dumb add [¶] asf" to which minor responded, "LMaoooo [¶] I'll kill ur whole family [¶] B[****]." Read together with A.G.'s messages, minor's statement "LMaoooo" indicates that, rather than engaging in humorous banter, minor was laughing at A.G.'s inaccurate belief that he would only kill her, rather than her entire family. Further, while A.G. testified that she was not afraid of minor, she also testified that minor "was probably mad" when he texted the threat to her, and Juan testified that she then told him he needed to watch his back, referring to the threat. Second, there is sufficient evidence to support the juvenile court's reasonable inference that minor intended the threat to be conveyed to and taken seriously by Juan. Juan and minor had a history of hostility because of minor's relationship with A.G. that A.G. was aware of, as Juan testified that minor had already assaulted him three to five months prior to minor's text messages to A.G., punching Juan five times in the face. Further, when A.G. told Juan about the text messages, she told him to "watch [his] back" because minor would kill him.

In *David L.*, the minor had been "harassing [the victim] for some time" when he approached the victim and the victim's friend and assaulted the victim. (*In re David L.*,

*supra*, 234 Cal.App.3d at p. 1658.) The minor then called the victim's friend the following day on the telephone and told her he was angry about the altercation. (*Ibid.*) When the victim's friend asked the minor what he was going to do, he told her to listen. (*Ibid.*) The victim's friend heard a metallic clicking sound and the minor told her the noise was made by " 'a gun, stupid.' " (*Ibid.*) The minor then told the victim's friend he was going to shoot the victim. (*Ibid.*) The following day, the victim's friend told the victim that the minor was planning to kill him. (*Ibid.*) The victim took the threat seriously and believed his life and the lives of his family were in danger. (*Ibid.*) The court found that "the climate of hostility between the minor and the victim in which the threat was made and the manner in which it was made readily support[ed] the inference the minor intended the victim to feel threatened." (*Id*. at p. 1659.) It explained, "[t]he communication of the threat to a friend of the victim who was also witness to certain of the antecedent hostilities supports the inference the minor intended the friend act as intermediary to convey the threat to the victim." (*Ibid.*)

Here, as in *David L.*, minor's communication of the threat to A.G. that he would kill her entire family, including Juan, when A.G. had already witnessed minor's prior assault on Juan, supports the juvenile court's reasonable inference that when minor communicated the threat to A.G., he intended for her to act as intermediary to convey the threat to Juan and for him to take the threat seriously.

Minor also contends his statement that he would kill A.G.'s whole family was not, "on its face and under the circumstances in which it was made, so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat." (See *Toledo*, *supra*, 26 Cal.4th at pp. 227–228.) Section 422 does not punish " 'angry utterances or ranting soliloquies, however violent.' " (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 861.) However, it does punish " 'the expression of an intent to inflict serious evil upon another person. [Citation.]' " (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805.) Here, A.G.

said to minor "ur gonna try to kill me."  Minor then expressly stated that he would not only kill her, but her whole family.  Minor had already assaulted Juan three to five months prior to the text conversation, punching him in the face five times when he was picking A.G. up from minor's residence.  Accordingly, under those circumstances and on the face of minor's messages, minor's threat that he would "kill [A.G.'s] whole family [¶] B[****]" was indeed an "expression of an intent to inflict serious evil upon another person" (*Ryan D.*, at p. 863) that was "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat" (see *Toledo*, at pp. 227–228).

Minor also insinuates that Juan's fear was not " 'reasonabl[e]' under the circumstances."  (See *Toledo*, *supra*, 26 Cal.4th at pp. 227–228).  He argues that his assault on Juan three to five months prior to the text messages was not very serious, because Juan did nothing to follow up on an alleged report to law enforcement he made about it and allowed his daughter to continue a daily relationship with minor even though he "supposedly was so in fear" of him.  However, Juan testified that when A.G. told him about minor's text, she also stated to Juan that he needed "to watch [his] back because [minor] was going to kill [him]."  Juan also testified that "after he assaulted me, it just stopped everything," and A.G. testified that minor was "probably mad" when he sent the text messages.  In addition, minor's messages to A.G. expressly stated he was going to kill her whole family, and although the altercation between minor and Juan happened a few months prior to the text messages, minor does not dispute he punched Juan in the face several times when it occurred.  Accordingly, the evidence supports the juvenile court's reasonable inference that Juan's fear upon hearing about minor's threat was " 'reasonabl[e]' under the circumstances."  (See *Toledo*, at pp. 227–228.)

Accordingly, as we accept all logical inferences that the juvenile court might have drawn from the evidence, we conclude there is sufficient evidence to support the court's finding in count 9 that minor made criminal threats to Juan in violation of section 422.

## **DISPOSITION**

The disposition order is affirmed.